MICHAEL KNIGHT, Plaintiff-Appellant, v. THE VILLAGE OF BARTLETT et al., Defendants-Appellees.

First District (5th Division)   No. 1—01—2991

Opinion filed March 28, 2003.

Law Offices of Thomas W. Duda, of Arlington Heights (Thomas W. Duda, of counsel), for appellant.

Cary J. Collins, of Hoffman Estates, for appellees.

JUSTICE QUINN delivered the opinion of the court:

Plaintiff, Michael Knight, appeals from an order of the circuit court affirming the Village of Bartlett Police Pension Board's decision to deny plaintiff's application for a work-related disability pension. The Village of Bartlett (Bartlett), the Bartlett Police Pension Board (Board), and its individually named members and various Bartlett officials were named as defendants.

Following a hearing, the trial court upheld the decision of the Village of Bartlett Police Pension Board denying plaintiff Michael Knight's disability pension application. On appeal, plaintiff argues

that: (1) the Board erred in finding that he was not disabled; (2) the Board should have found that his disability was duty-related; and (3) in the alternative, the Board should have found that his disability was non-duty-related. For the following reasons, we reverse the decisions of the trial court and the Board and enter judgment in favor of plaintiff, Michael Knight.

## BACKGROUND

On January 10, 2000, Michael Knight (plaintiff), filed an application with the Board seeking a duty-related disability pension. On May 8, 2000, the Board held a hearing to consider plaintiff's application and plaintiff testified that he had been a police officer in Bartlett for over 16 years. Before joining the Bartlett police department, plaintiff was a Cook County deputy sheriff for four years. Plaintiff was always a patrolman in Bartlett. In 1997, he was assigned to the Metropolitan Enforcement Group (MEG) of Cook County. MEG was a narcotics task force, and its officers were involved in undercover drug-buy operations. Plaintiff testified that as a MEG officer, he had made 50 to 75 arrests, and the majority of these arrests involved physical struggles with the arrestees. While assigned to MEG, plaintiff had been hit in the face and his life had been threatened.

In January 1999, plaintiff's ex-girlfriend lodged a complaint against him. Because he was a MEG officer, he was investigated by the Illinois State Police. The State Police investigation cleared plaintiff. After the state's investigation, the Bartlett police department launched it own internal investigation of plaintiff. Bartlett found plaintiff had used his official cell phone for personal calls and had taken long lunch breaks.

Plaintiff testified that while he was working as an undercover officer and being investigated by internal affairs, he started developing emotional problems, had difficulty sleeping and had recurring nightmares. Plaintiff further testified that he had many nightmares of going into a staff meeting and shooting at people in the meeting.

In March 1999, plaintiff was reassigned back from MEG to the Bartlett police department as a patrolman. In June 1999, while the Bartlett internal investigation was still under way, plaintiff had a verbal altercation with Bartlett Police Chief Daniel Palmer (Chief Palmer) during which plaintiff demanded the internal investigation on him be ended. As a result of the altercation, plaintiff received a five-day suspension.

On cross-examination, plaintiff testified that he dreamed of shooting Chief Palmer, Deputy Chief Dan Maloney and Bob Nicholas. Plaintiff believed these people were carrying out a personal vendetta

against him. Plaintiff further testified that because he "started feeling the nightmares during daytimes," he went to see Dr. Julia Klco for help. Dr. Klco, a psychologist, recommended that plaintiff take a three-month stress leave from the police department because of his homicidal ideation. On June 6, 1999, plaintiff applied for and received from the police department a three-month leave due to stress. At the end of the leave, plaintiff was asked to surrender his police identification card and his badge and he was not allowed to return to work as a police officer. After not being allowed to return to work, plaintiff filed a disability petition with the Board. Throughout the hearing, plaintiff maintained that he did not believe he was disabled, and he wanted to resume his job as a police officer.

Plaintiff's fiancée, Stephanie Zizek, testified that she was living with plaintiff. She had seen and heard plaintiff "moaning, yelling and shaking" in his sleep. Zizek also testified that she believed plaintiff saw Chief Palmer and Deputy Chief Maloney in his nightmares.

Deputy Chief Maloney testified he had taken disciplinary action against plaintiff in the past. However, plaintiff never made any threats to him, nor did Deputy Chief Maloney ever hear that plaintiff had threatened any other employees in the department.

Chief Palmer testified that he had worked for the Bartlett police department since 1979. He had been the chief of police for the last seven years. Throughout these years, Chief Palmer had worked with plaintiff in various capacities. Chief Palmer testified that plaintiff had became more "aggressive, demanding, and pushy" since his tour in MEG. Chief Palmer further testified that one day in June 1999, plaintiff had walked into his office and demanded the internal investigation of him be ended. During this confrontation, Chief Palmer testified that plaintiff leaned across Chief Palmer's desk and stuck his finger in Chief Palmer's face. Chief Palmer felt threatened during the confrontation. Chief Palmer then ordered plaintiff to leave his office. As a result of this confrontation, Chief Palmer suspended plaintiff for five days.

During the meeting with the police union regarding plaintiff's suspension, Chief Palmer suggested to the union representative that he advise plaintiff to get an evaluation. Shortly after, Chief Palmer received a report from Dr. Klco stating plaintiff had homicidal ideation. Upon seeing this report, Chief Palmer immediately ordered plaintiff to see Dr. Chiapetta, who performed work for the Bartlett police department. Dr. Chiapetta in turn referred plaintiff to Dr. Alexander Obolsky, a specialist in workplace violence. Based on Dr. Obolsky's report, Chief Palmer requested that plaintiff turn in his police identification and badge to the department. Chief Palmer then placed plaintiff on

administrative leave pending the ruling on plaintiff's disability pension application. Chief Palmer testified that he did not believe plaintiff was fit to be a police officer.

On cross-examination, Chief Palmer testified that plaintiff was an average police officer prior to the MEG assignment. However, Chief Palmer noticed that plaintiff had a severe change in personality after he returned from MEG. Chief Palmer further testified that he felt threatened by plaintiff's "tone of voice, the body language, his eyes, and the whole thing."

During the hearing, the reports of psychologists Klco and Rabin and the report of Dr. Chiapetta were admitted into evidence. The certificates of disability and medical reports of Drs. Alexander E. Obolsky, Sheldon J. Meyers, Arnold Tobin and Michael Rabin were also admitted into evidence before the Board.

Dr. Obolsky, an expert in workplace violence, after having interviewed plaintiff for two hours, opined that plaintiff was permanently disabled, preventing him from performing police work. In the medical report, Dr. Obolsky stated "with a reasonable degree of medical psychiatric certainty that Officer Knight is currently unfit for duty as police officer ***. Officer Knight's unfit status is duty-related."

Dr. Sheldon J. Meyers, one of the three doctors selected by the Board, certified that plaintiff was permanently disabled for purposes of carrying out police work and that plaintiff's disability was duty-related. In his medical report, Dr. Meyers concluded that because plaintiff had homicidal ideation, it would not be appropriate for plaintiff to return to police duty.

Dr. Arnold Tobin, the second doctor selected by the Board, also examined plaintiff for the disability hearing. Dr. Tobin also certified that plaintiff was permanently disabled for purposes of performing police service. In his report, Dr. Tobin wrote that plaintiff was unfit for duty as a police officer and that he was suffering from passive-aggressive personality disorder. In addition, Dr. Tobin found plaintiff also had previously suffered from post-traumatic stress disorder, which had been reawakened by the events of the past few years.

Dr. Richard P. Harris, the third doctor selected by the Board, initially concluded plaintiff was not permanently disabled for police service. Dr. Harris opined that plaintiff's problem was not a disability but, rather, an employment problem. In his initial report, Dr. Harris also pointed out that Knight was "not depicting himself as impaired so that he can collect disability money." Upon reviewing the opinions of the other doctors, Dr. Harris concluded that plaintiff had psychological problems but that plaintiff was not psychologically disabled.

The Board concluded that, in pertinent part:

"1. ***

2. The applicant suffers from a psychological problem related to employment issues.

3. The applicant due to his severe personality disorder is unfit to return to duty as a police officer with the Village of Bartlett Police Department due to employment issues with the Police Department Administration.

4. The applicant is not entitled to a duty related disability as he is not fully disabled so as to cause retirement or separation from the police service, and that further counseling is needed before he may return to duty."

The Board held that plaintiff was not entitled to either a duty-related disability under section 3—114.1 or a non-duty disability under section 3—114.2 of the Pension Code (40 ILCS 5/3—114.1, 3—114.2 (West 2000)).

## ANALYSIS

### STANDARD OF REVIEW

■ Article III of the Pension Code provides that judicial review of the Board's decisions must be in accordance with the Administrative Review Law (735 ILCS 5/3—101 et seq. (West 1994)). 40 ILCS 5/3—148 (West 1994); Robbins v. Board of Trustees of the Carbondale Police Pension Fund, 177 Ill. 2d 533, 537 (1997). The Administrative Review Law provides that our review extends to all questions of law and fact presented in the record before us. Robbins, 177 Ill. 2d at 537-38. The statute limits any court's review to the record before it; the court may not hear new or additional evidence. Robbins, 177 Ill. 2d at 538. The statute also mandates that the "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 3—110 (West 2000).

■ A reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence. City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 204 (1998). An administrative agency's factual determinations are contrary to the manifest weight of the evidence where the opposite conclusion is clearly evident. Belvidere, 181 Ill. 2d at 204. An administrative agency's determinations regarding questions of law are reviewed de novo. Belvidere, 181 Ill. 2d at 205. An agency's interpretation of a statute is a question of law. Albazzaz v. Department of Professional Regulation, 314 Ill. App. 3d 97, 105 (2000). Determinations regarding mixed questions of fact and law are not to be disturbed unless they are clearly erroneous. Belvidere, 181 Ill. 2d at 205. As the Board's decision in the instant case involved a mixed question of fact and law, we will apply the clearly erroneous standard in reviewing this case.

## DISABILITY

■ Illinois Pension Code section 3—114.1 provides for a line-of-duty disability pension as follows:

"Disability pension—Line of Duty. If a police officer as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty, is found to be physically or mentally disabled for service in the police department, so as to render necessary his or her suspension or retirement from the police service, the police officer shall be entitled to a disability retirement pension of 65% of the salary attached to the rank on the police force held by the officer at the date of suspension of duty or retirement. A police officer shall be considered 'on duty' while on any assignment approved by the chief of the police department of the municipality he or she serves, whether the assignment is within or outside the municipality." 40 ILCS 5/3—114.1 (West 2000).

■ In contrast, Pension Code section 3—114.2 sets out the circumstances under which a police officer is entitled to a non-duty-related disability pension:

"Disability pension—Not on duty. A police officer who becomes disabled as a result of any cause other than the performance of an act of duty, and who is found to be physically or mentally disabled so as to render necessary his or her suspension or retirement from police service in the police department, shall be entitled to a disability pension of 50% of the salary attached to the officer's rank on the police force at the date of suspension of duty or retirement." 40 ILCS 5/3—114.2 (West 2000).

■ Illinois Pension Code section 3—115 provides:

"A disability pension shall not be paid unless there is filed with the board certificates of the police officer's disability, subscribed and sworn to by the police officer if not under legal disability, or by a representative if the officer is under legal disability, and by the police surgeon (if there be one) and 3 practicing physicians selected by the board. The board may require other evidence of disability." 40 ILCS 5/3—115 (West 2000).

In this case, it is undisputed that plaintiff filed a disability pension application after the Bartlett police department refused to allow him to continue working as a Bartlett police officer. Plaintiff was examined by Dr. Klco, a psychologist referred by the police union; Dr. Chiapetta, a psychiatrist referred by Chief Palmer; Dr. Rabin, a psychologist referred by Dr. Obolsky (a workplace violence specialist); and three doctors selected by the Board, Drs. Meyers, Tobin, and Harris.

Dr. Obolsky found plaintiff disabled, stating "with a reasonable degree of medical psychiatric certainty that [plaintiff] is currently unfit for duty as police officer ***. [Plaintiff's] unfit status is duty-

related." Dr. Sheldon J. Meyers concluded plaintiff was permanently disabled and "unfit for duty because of homicidal ideation." Dr. Arnold Tobin opined plaintiff was permanently disabled because he was "unfit for duty as a police officer and that he [was] suffering from a passive-aggressive personality disorder."

Dr. Richard Harris was the only doctor who expressed an opinion that plaintiff was not disabled. Dr. Harris initially concluded plaintiff was not disabled because he had "an employment issue rather than a disability." However, upon reviewing the other doctors' reports, Dr. Harris commented:

> "The review of psychological testing would suggest that Officer Knight has quite severe psychological problems. For instance, there are references to delusional thinking, borderline personality characteristics, schizoid features and repressed hostility and anger ***. The statement 'they may display disturbed thinking, including delusions of persecution or grandeur in ideas of reference' suggests severe pathology."

Dr. Harris discounted the results of the psychological testing and concluded:

> "Officer Knight does have psychological problems ***. However, such problems are a function of longstanding patterns of functioning, thinking and feeling. In other words, he is not suffering from an acute disturbance that is causing a significant limitation in his overall functioning. He is not psychologically disabled. Lack of fitness for duty and disability are not one and the same. The department apparently believes he does not have the psychological capacities to function effectively as a police officer. If he were applying to be a police officer at this time, he would not be offered a job. The lack of offer would not be due to the fact that he has psychiatric disability."

In this case, Drs. Obolsky, Meyers and Tobin found plaintiff was permanently disabled because he was "unfit" to be a police officer. Dr. Harris similarly concluded plaintiff had a "lack of fitness for duty" and yet he was not psychologically disabled. The record indicates Dr. Harris used the phrase "lack of fitness for duty" to describe plaintiff as no longer being capable of performing the duties of a police officer. Thus, "lack of fitness" is synonymous with "unfit." As stated earlier, all of the other doctors stated plaintiff was "unfit" because (1) he was "permanently disabled" (Dr. Obolsky); (2) he was permanently disabled because of "homicidal ideation" (Dr. Meyers); and (3) he was permanently disabled due to his suffering from a "passive-aggressive personality disorder" (Dr. Tobin).

In addition, the nonmedical evidence supports the conclusion that plaintiff was disabled. Plaintiff's fiancée testified plaintiff was moan-

ing, yelling and shaking in his sleep. Plaintiff testified that he dreamed of going into a staff meeting shooting people. Plaintiff further testified that he "started feeling the nightmares during daytimes." Plaintiff served as a police officer without incident for more than 20 years. During that time, it is apparent that Knight had the psychological capacity to function effectively as a police officer. Chief Palmer testified that plaintiff had severe personality changes after his MEG tour of duty. The evidence was compelling that plaintiff was no longer capable of working as a police officer.

In denying plaintiff's disability pension, the Board relies upon Dr. Harris's finding that Knight is not psychologically disabled. Dr. Harris never changed his opinion that Knight was fit to return to duty without restriction. He merely said that the "department apparently believes he does not have the psychological capacities to function effectively as a police officer."

After considering all of the evidence, the Board found that Knight "suffers from a psychological problem related to employment issue" and had "a severe personality disorder which made him unfit to return to duty as a police officer *** due to employment issues." These findings support a finding of disability.

■ Section 3—114.2 of the Pension Code provides: "A police officer who becomes disabled as a result of any cause other than the performance of an act of duty, and who is found to be physically or mentally disabled so as to render necessary his or her suspension or retirement from police service in the police department, shall be entitled to a disability pension of 50% ***." 40 ILCS 5/3—114.2 (West 2000). Section 5—115 of the Pension Code defines disability as "[a] condition of physical or mental incapacity to perform any assigned duty or duties in the police services." 40 ILCS 5/5—115 (West 2000). In its written decision, the Board stated: "The Pension Board agrees that Officer Knight with his present mental state should not be returned to duty as a police officer."

■ When the Board found that Knight's "mental condition" rendered necessary his suspension or retirement from police service, it could not deny Knight a disability pension based on the opinion of one of its own experts who did not find him unfit for duty. In his conclusion, Dr. Harris commented that the police department itself believed that Knight did not have the psychological capacity to function effectively as a police officer. This clearly amounts to a "condition of *** mental incapacity to perform any assigned duty or duties in the police service." This is the definition of disability as found in section 5—115 of the Pension Code. 40 ILCS 5/5—115 (West 2000).

The Board's conclusion stated that plaintiff was "not entitled to a

duty related disability as he is not fully disabled so as to cause retirement or separation from the police service, and that further counseling is needed before he may return to duty." The Board's conclusion that plaintiff was "not fully disabled so as to cause *** separation from the police service" is directly contradicted by the Bartlett police department's own actions in removing plaintiff from his job and refusing to return him to duty. As such, the Board's factual finding that plaintiff was not fully disabled is against the manifest weight of the evidence and its decision to deny plaintiff a disability pension is clearly erroneous.

On appeal, the Board cites to *Wall v. Police Pension Board*, 178 Ill. App. 3d 438 (1988), and *Daily v. Board of Trustees of the Police Pension Fund*, 251 Ill. App. 3d 119 (1993), as support. Defendants' reliance on these cases is misplaced.

In *Wall*, the issue on appeal was whether Officer Wall was entitled to a job-related disability pension. Wall was examined by five doctors. The first two doctors had seen Wall on two occasions and had written a joint letter to the Board stating that Wall was suffering from the separation from his wife 1½ years before. These doctors opined that Wall might also have been suffering from major depression. However, the doctors declined to speculate whether Wall's stress was job-related. The third doctor had seen Wall once and stated that Wall was too emotionally disoriented to return to work. However, the doctor could not state with certainty that Wall's disorder was job-related. The fourth doctor who examined Wall wrote that he was suffering from major depression. The doctor suggested a genetic factor was behind Wall's depression and declined to draw a correlation between Wall's work as a police officer and his depression. Wall called a clinical psychologist to testify. But that psychologist could not testify whether Wall was actually suffering from police stress because he had never met or examined Wall.

Wall testified that he was no longer having fun, that he could no longer deal with the public's negative response to him and that he was frustrated because he was not advancing in his career. The board called a private psychiatrist who examined Wall on two occasions. The psychiatrist opined that Wall was suffering from an adjustment disorder and that a key factor in Wall's stress was that he did not like being a police officer. *Wall*, 178 Ill. App. 3d at 440-41.

In their opinion, the appellate court expressly considered the argument propounded by the Illinois Pension Fund Association that claims of police stress would often be fraudulently filed and that dissatisfied officers would view such claims as a more favorable alternative to changing careers. *Wall*, 178 Ill. App. 3d at 442. The court also com-

mented on the fact that neither of the doctors who testified said that Wall was suffering from police stress and that "none of the doctors who wrote letters on plaintiff's behalf would even speculate whether plaintiff's stress was job related." *Wall*, 178 Ill. App. 3d at 443. The appellate court affirmed the board's finding that Wall did not prove his stress was the result of the performance of his duties. See *Wall*, 178 Ill. App. 3d at 444.

The facts in the case *sub judice* are wholly inapposite to the facts in *Wall*. Here, it was the police department that refused to allow Knight to return to duty. Further, every professional who examined Knight, with the exception of Dr. Harris, found that Knight suffered from police stress and he was unfit for duty as a police officer. Further, even Dr. Harris opined that Knight was not depicting himself as being disabled so that he could collect a pension.

In *Daily*, the plaintiff police officer was suspended for 90 days for insubordination. After the suspension was over, Daily refused to return to work. The city later filed written charges seeking his discharge. Daily filed an application seeking a disability pension. The police pension board concluded that Daily's stress resulted from conflict with superiors rather than any act of duty. The board also found that Daily did not suffer from a mental disability that rendered him unable to serve on the police department. *Daily*, 251 Ill. App. 3d at 121. The trial court affirmed the board's denial of disability benefits because the plaintiff failed to establish that a suspension or retirement from police service was necessary or that any alleged mental disability resulted from any act of duty. *Daily*, 251 Ill. App. 3d at 121. The appellate court affirmed, commenting that no physician determined that Daily was unfit for duty. *Daily*, 251 Ill. App. 3d at 124-25.

In this case, both psychologists and three of the four psychiatrists who examined plaintiff found him to be unfit for duty. The same three psychiatrists stated unequivocally that plaintiff was disabled, and his disability was duty-related. The police department refused to allow plaintiff to return to work as a police officer. *Daily* is wholly inapposite to the case *sub judice*.

On appeal, the Board also argues that it correctly denied plaintiff's pension application because plaintiff maintained throughout the hearing that he was not disabled and was fit to return to work as a police officer.

In the instant case, the Bartlett police department did not offer plaintiff, a 16-year veteran, his job back after his stress leave. To the contrary, the record shows that Chief Palmer ordered plaintiff to surrender his police identification and badge at the end of his stress leave. Chief Palmer placed plaintiff on administrative leave pending

the disability ruling of the Board. Chief Palmer testified in the disability hearing that he did not believe plaintiff was fit to be employed as a police officer in Bartlett. With the exception of Dr. Harris, every doctor who examined Knight said that he was unfit to be employed as a police officer. If the Board truly believes that Knight is fit for duty as a police officer, as it argues here, the Bartlett police department should reinstate Knight. Of course, the Department will not do so because Knight is clearly unfit, making his retirement from police service necessary. Under these circumstances, the Board's argument that the denial of plaintiff's disability application is correct because plaintiff claimed he was fit to return to work and was not disabled is specious.

## LINE OF DUTY

■ Under the Pension Code, in order to receive a pension under section 3—114.1, the officer's disability must have resulted from an "act of duty." 40 ILCS 5/3—114.1 (West 2000). Section 5—113 of the Pension Code defines an "act of duty" as follows:

> "Act of duty. 'Act of duty': Any act of police duty inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life, imposed on a policeman by the statutes of this State or by the ordinances or police regulations of the city in which this Article is in effect or by a special assignment; or any act of heroism performed in the city having for its direct purpose the saving of the life or property of a person other than the policeman." 40 ILCS 5/5—113 (West 2000).

■ In *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill. 2d 533 (1997), the Illinois Supreme Court held that " '[i]n examining claims of duty-related stress like the one made in the instant case, courts have required that plaintiff-police officers demonstrate their disabilities are the result of a specific, identifiable act of duty unique to police work.' [Citations.]" *Robbins*, 177 Ill. 2d at 542. " 'Conversely, where the disability is traceable only to the "general nature of being a police officer" and not to a specific act of police service, line-of-duty disability pensions are denied.' " *Robbins*, 177 Ill. 2d at 542, quoting *Trettenero v. Police Pension Fund*, 268 Ill. App. 3d 58, 63 (1994), quoting *Ryndak v. River Grove Police Pension Board*, 248 Ill. App. 3d 486, 490 (1993). Similarly, where the causes of the stress are not unique to police work, line-of-duty disability pensions are also denied. *Robbins*, 177 Ill. 2d at 542. " 'These general rules are an outgrowth of judicial attempts to define and apply the term "act of duty" to cases involving claimed psychological disabilities.' [Citation.]" *Robbins*, 177 Ill. 2d at 542. Thus, in order to be eligible for a line-of-duty disability, the applicant's psychological disability must result from " 'a "special risk, not ordinarily assumed by a

citizen in the ordinary walks of life." ' [Citations.]" *Robbins*, 177 Ill. 2d at 542.

■ In this case, the record contains ample evidence that plaintiff's stress was the result of his undercover police work in MEG. Plaintiff was a deputy sheriff for four years prior to joining the Bartlett police department. Plaintiff was a Bartlett patrolman for about 14 years prior to being assigned to MEG. Chief Palmer testified that throughout all these years plaintiff was an average police officer.

While assigned to MEG, plaintiff's duties involved participation in undercover drug-buy operations. It is undisputed that as an undercover police officer, plaintiff's life was often threatened. Furthermore, it was also unrebutted that plaintiff had made 50 to 75 arrests during his two-year assignment to MEG. A high percentage of these arrests involved physical struggles. The record shows that it was at this time that plaintiff's emotional problems became evident, he suffered from nightmares and had homicidal ideation.

Chief Palmer testified that plaintiff had a severe personality change since returning from MEG. This observation was corroborated by the medical doctors. Three of the four doctors who had examined plaintiff opined that his psychological problems were duty related. Again, Dr. Harris was the only doctor who opined that Knight's mental disability was not the result of a sickness incurred in or resulting from the performance of an act of duty. While the Board rejected Dr. Harris's opinion that Knight was fit for duty as a police officer, it argued that Dr. Harris was correct in finding that Knight's psychological problems are of long duration. Dr. Rabin explained that Knight had preexisting personality traits that did not rise to the level of a personality disorder. These traits worsened under the stress Knight was subjected to and they could develop into a debilitating personality disorder. Knight's superiors and fiancée testified that they noticed the severe disorder only after Knight was assigned to MEG. Based on this overwhelming evidence, we find that plaintiff's disability was "incurred in or resulted from the performance of an act of police duty." As such, plaintiff is entitled to a duty-related disability pension. The Board's factual findings to the contrary are against the manifest weight of the evidence and its decision to deny plaintiff a duty-related disability pension is clearly erroneous.

■ Finally, defendants argue for the first time on appeal that as a matter of public policy, plaintiff should not receive a disability pension because he made threats toward his superiors in the police department.

In this case, defendants have waived this issue. "Questions not raised in the trial court cannot be argued for the first time on appeal." *Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d 342, 355 (1998).

Accordingly, we reverse the decisions of the trial court and the Village of Bartlett Police Pension Board. We remand this matter to the Village of Bartlett Police Pension Board with instructions to grant plaintiff a duty-related disability pension.

Reversed and remanded.

CAMPBELL, P.J., and REID, J., concur.