842 N.E.2d 180 (2005)
363 Ill. App.3d 58
299 Ill.Dec. 441
VILLAGE OF STICKNEY, an Illinois municipal corporation, Plaintiff-Appellant,
v.
BOARD OF TRUSTEES OF the POLICE PENSION FUND OF the VILLAGE OF STICKNEY, George Philippon, in his official capacity, Carroll J. Kadolph, in his official capacity, Joseph A. Kretch, in his official capacity, Lisa M. Walik, in her official capacity, and Richey A. Hare, Defendants-Appellees.
No. 1-05-1238.
Appellate Court of Illinois, First District, Second Division.
December 20, 2005.
*181 Donald J. Kreger and Ruth E. Krugly, Schiff Hardin LLP, Chicago, for Appellant.
Richey Hare, Richard J. Puchalski, Law Offices of Richard J. Puchalski, Chicago, for Appellee.
*182 Justice WOLF delivered the opinion of the court:
The defendant Richey A. Hare (Hare) was awarded a line-of-duty disability pension by the Board of Trustees of the Police Pension Fund of the Village of Stickney (Board).
Hare presented evidence in an administrative hearing before the Board. In a previous decision, we held the Board did not abuse its discretion in denying the Village's request to participate in the hearing as a "party in interest." Village of Stickney v. Board of Trustees of the Police Pension Fund of the Village of Stickney, 347 Ill.App.3d 845, 854, 283 Ill.Dec. 237, 807 N.E.2d 1078 (2004). We remanded the cause to the circuit court for a determination of whether the Board's decision to award Hare a line-of-duty disability pension was against the manifest weight of the evidence. Village of Stickney, 347 Ill. App.3d at 854, 283 Ill.Dec. 237, 807 N.E.2d 1078. The circuit court upheld the Board's decision. The Village appeals. We affirm.

FACTS
At the hearing, Hare testified he was treated for panic attacks beginning in 1996. The attacks were the result of stress from doing undercover work, a heavy case load, and not having enough protection because of overtime and personnel constraints.
In 1999, Hare continued to experience panic attacks and was under the care of a psychiatrist. In May 1999, Hare's boss, Commander Gibas, died. In addition to his other duties, Hare was placed in charge of the evidence locker. Hare performed an audit of the evidence locker and discovered certain items of evidence were missing. The missing evidence included money, drugs, and guns. Other items such as jewelry and gold coins had been converted to paper money. Hare reported the missing evidence to his new boss, Chief Zitek. Zitek denied Hare's request for an independent audit. He told Hare not to make an issue of it, that Gibas was responsible, and "it lies with the dead man."
On two occasions, Zitek offered Hare cash bonuses for private security jobs. Hare refused the money, which he believed belonged to the Village. Hare's symptoms increased after the interactions with Zitek.
In March 2000, Hare discovered a radio operator had been forging Hare's computer signature to run criminal histories on convicted felons. When Hare reported the incident, Zitek said he would fire the operator. The operator was not fired. Hare reported the incident to the mayor and a Village trustee. He also reported other incidents of corruption involving the chief.
Following these incidents, the detective unit was disbanded. Hare was reassigned as a shift commander in the patrol division. Hare considered his re-assignment a demotion. Hare said other officers were told to stay away from him and not to respect his rank or authority. The Cook County state's attorney's office began an investigation of the department. Hare testified before the grand jury.
In December 2000, Hare responded to a call of an alleged rape. He asked Zitek for press coverage because the rape was committed by a perpetrator unknown to the victim. Zitek told Hare the case did not warrant further investigation.
In April 2001, the victim of the alleged rape incident told Hare that Zitek had approached her and offered her gifts in exchange for filing a sexual assault case against Hare. The woman repeated her story to other officers. At the time, Hare was experiencing constant extreme panic attacks and being treated by the department's psychiatrist. A week later, the Cook County sheriff's department began *183 investigating the sexual assault charge against Hare. Hare left work on May 17, 2001 and did not return. Hare said his doctor advised him to distance himself as far away from the police department as possible.
Hare said he felt he was a danger to himself and to other officers because other officers were afraid to work with him. He had seen people killed a number of times while he was a police officer, but he did not believe that had anything to do with his case. Hare said, "I believe that everything that's happening to me is a direct result of my boss, not because of anything else; and I stand by that."
Three certificates of disability and doctors' reports were admitted into evidence. All three doctors certified that Hare was permanently disabled from police service and opined that Hare's disability was duty-related. Dr. Sheldon J. Meyers said Hare first developed panic attacks in 1996 when he was doing undercover narcotics work. He suffered from chest pain, heart palpitations, sweating, shortness of breath, and numbness. He was hospitalized on two occasions and was prescribed Xanax and Klonopin for his anxiety. His symptoms subsided after being transferred to a detective unit. Hare had an excellent record as a police officer and was promoted quickly to detective, sergeant, then to lieutenant.
Hare told Dr. Meyers his problems began in May 1999 after his boss, Commander Gibas, died. Hare was promoted to commander and assigned to manage the evidence locker. Hare said he discovered certain irregularities in the audit of the evidence locker. He said he did not want to be in the middle of any alleged corruption. Hare began to hyperventilate and experience chest pains and numbness. He was treated for anxiety and panic attacks and received Klonopin and Celexa in high doses. Hare accused the new chief of terrorizing and harassing him. He and the chief would get into shouting matches, and the chief "cut him out of the picture" in the department. Hare felt his job was in jeopardy and felt he could no longer work under the stress. He turned in his gun because he was afraid of hurting himself or someone else. Following the investigation of alleged corruption in the department, Hare said he began to feel persecuted in the department. He left his job in April 2001 because he felt he could not function as a police officer and feared his condition could affect the safety of others. Dr. Meyers concluded:
"I think Mr. Hare is disabled for duty as a police officer as a result of his inability to function under the stress that he is experiencing. I do not know whether any of Mr. Hare's allegations are true, but he believes them to be true. There is internal consistency to his story. As a result of the alleged evidence missing from the evidence locker, and other alleged corruption in the police department all relating to the performance of his duty as a policeman Mr. Hare is disabled and his disability would be duty related."
According to Dr. Ronald B. Baron's report, Hare "found himself in an increasingly uncomfortable situation" in May 1999, after his boss died. This resulted in a series of increasingly difficult events to the point that Hare felt he could no longer function as a police officer. His panic attacks increased in frequency, and his medication was increased. Hare suffered from symptoms of depression, suicidal thoughts, and other symptoms that interfered with his life. Dr. Baron said Hare was unfit for duty and had a duty-related psychiatric condition.
Dr. Tahir Sheik, Hare's treating physician, submitted a report that said Hare *184 was suffering from posttraumatic stress disorder and severe depression. He was unable to function in his day-to-day life, including his job. Dr. Sheik did not address the cause of Hare's condition, but he opined that Hare had a duty-related disability.
The Board issued its decision granting Hare a line-of-duty disability pension. The Board found Hare's psychological disability was duty-related and was unique to police service. The Board relied on Hare's testimony regarding the missing evidence, the chief advising Hare to drop the rape investigation, and the subsequent investigation of Hare. The Board also relied on the reports of Dr. Meyers and Dr. Sheikh that concluded Hare's disability was duty-related, and on the note in Dr. Meyers' report that Hare's panic attacks began in 1996 while Hare was performing undercover narcotics work. The circuit court affirmed the Board's decision, finding it was not against the manifest weight of the evidence.

DECISION
A police officer awarded a line-of-duty disability pension is entitled to 65% of his salary at the time of suspension of duty. 40 ILCS 5/3-114.1 (West 2002). An officer awarded a non-duty disability pension receives 50% of his salary. 40 ILCS 5/3-114.2 (West 2002). Section 3-114.1 of the Illinois Pension Code provides a police officer is entitled to a line-of-duty disability pension if the officer, "as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty, is found to be physically or mentally disabled for service in the police department, so as to render necessary his or her suspension or retirement from the police service." (Emphasis added.) 40 ILCS 5/3-114.1 (West 2002).
The Code defines an "act of duty" as, in part:
"[a]ny act of police duty inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life, imposed on a policeman by the statutes of this State or by the ordinances or police regulations of the city in which this Article is in effect or by a special assignment." (Emphasis added.) 40 ILCS 5/5-113 (West 2002).
Under the Administrative Review Law, 735 ILCS 5/3-101 et seq. (West 1996), we review the administrative agency's decision, not the circuit court's determination. Martino v. Police Pension Board of the City of Des Plaines, 331 Ill.App.3d 975, 979, 265 Ill.Dec. 251, 772 N.E.2d 289 (2002). The agency's decisions on questions of fact are deemed to be prima facie true and correct and may be set aside only if they are against the manifest weight of the evidence. Anderson v. Illinois Dept. of Professional Regulation, 348 Ill.App.3d 554, 560, 284 Ill.Dec. 575, 810 N.E.2d 228 (2004). An agency's findings and decisions are against the manifest weight of the evidence if the opposite conclusion is clearly evident. City of Belvidere v. Illinois State Labor Relations Board, 181 Ill.2d 191, 205, 229 Ill.Dec. 522, 692 N.E.2d 295 (1998), citing Abrahamson v. Illinois Dept. of Professional Regulation, 153 Ill.2d 76, 88, 180 Ill.Dec. 34, 606 N.E.2d 1111 (1992).
In claims involving duty-related stress, courts require officers to demonstrate their disabilities are the result of a specific, identifiable act of duty unique to police work. Robbins v. Board of Trustees of the Carbondale Police Pension Fund of the City of Carbondale, Illinois, 177 Ill.2d 533, 542, 227 Ill.Dec. 116, 687 N.E.2d 39 (1997). Courts deny line-of-duty disability pensions where the disability is traceable only to the "general nature of being a police officer" and not to a specific act of *185 police service, or where the causes of the stress are not unique to police work. Robbins, 177 Ill.2d at 542, 227 Ill.Dec. 116, 687 N.E.2d 39. Civilians regularly suffer stress in many aspects of their jobs. Thus, a police officer's psychological disability must result from "a `special risk, not ordinarily assumed by a citizen in the ordinary walks of life.'" Robbins, 177 Ill.2d at 543, 227 Ill.Dec. 116, 687 N.E.2d 39, quoting 40 ILCS 5/5-113 (West 1994).
Both parties agree Hare suffered from a psychological disability rendering him unfit to perform his duties as a police officer. The issue is whether his disability was incurred in or resulted from a specific act of police work not ordinarily performed by a civilian.
The Village contends Hare is not entitled to a duty-related disability pension because Hare's disability was the result of problems he had with the police chief in the context of his general duties as a police officer. Courts have held that stress resulting from difficulties with one's boss or supervisor or from the general trauma associated with being a police officer does not entitle an officer to a duty-related disability pension.
In Robbins, the supreme court reversed the appellate court and upheld the board's denial of duty-related benefits. The officer's stress resulted from his supervisor's criticism of his reports, his anxiety that his fellow patrol officers were younger and better trained, and an incident in which Robbins witnessed a man commit suicide by shooting himself in the face. Robbins, 177 Ill.2d at 536, 227 Ill.Dec. 116, 687 N.E.2d 39. The court held the appellate court erred in awarding Robbins a line-of-duty disability pension based on "generalized police stress of multiple origins." Robbins, 177 Ill.2d at 543, 227 Ill.Dec. 116, 687 N.E.2d 39. Four psychologists reported that while Robbins' stress was related to his police work, it was not connected to any specific act. Robbins, 177 Ill.2d at 544, 227 Ill.Dec. 116, 687 N.E.2d 39. One doctor concluded Robbins suffered daily stress beginning with his reassignment, while another doctor concluded his stress was caused by the "continuous exposure to violence" and the "pace of his duties in general." Robbins, 177 Ill.2d at 544, 227 Ill.Dec. 116, 687 N.E.2d 39.
In Ryndak v. River Grove Police Pension Board, 248 Ill.App.3d 486, 490, 188 Ill.Dec. 36, 618 N.E.2d 606 (1993), the court affirmed the board's decision denying the officer a line-of-duty disability pension. The stress and depression Ryndak claimed to suffer as a result of the violent nature of his police duties were problems related to the general nature of being a police officer, not to a specific act of police service. Ryndak, 248 Ill.App.3d at 490, 188 Ill.Dec. 36, 618 N.E.2d 606. Furthermore, Ryndak's complaints of stress caused by being named as a defendant in a civil rights lawsuit, receiving little support from superiors, and seeing a co-worker die of a heart attack were not unique to police work. Ryndak, 248 Ill.App.3d at 490, 188 Ill.Dec. 36, 618 N.E.2d 606.
In Coyne v. Milan Police Pension Board, 347 Ill.App.3d 713, 717-18, 283 Ill. Dec. 435, 807 N.E.2d 1276 (2004), the officer contended he suffered psychiatric impairment as a result of numerous traumatic work experiences, including disagreements with his supervisor, injury when his car was hit by a drunk driver, and the witnessing of death and threat of death. The court affirmed the board's denial of a duty-related disability pension. Evidence showed Coyne's psychological disorder was the result of the cumulative effect of traumatic duties performed over his career; medical evidence showed no specific act of employment caused the disorder. *186 Coyne, 347 Ill.App.3d at 725, 283 Ill.Dec. 435, 807 N.E.2d 1276.
Similarly, in Batka v. Board of Trustees of the Village of Orland Park Police Pension Fund, 186 Ill.App.3d 715, 724, 134 Ill.Dec. 489, 542 N.E.2d 835 (1989), the court held the plaintiff was not entitled to line-of-duty benefits because no causal relationship existed between Batka's duties as a police officer and his alleged stress. The court found the plaintiff's problems were not unique to police officers. They included: his excessive work hours and work load, his inability to take vacation time, numerous disagreements with the chief of police, physical problems, his disappointment at failing the sergeant's exam, his difficulty with a case in which a child had drowned, and teasing from other officers. Batka, 186 Ill.App.3d at 717-18, 134 Ill.Dec. 489, 542 N.E.2d 835.
See also Wall v. Police Pension Board of the Village of Schaumburg, 178 Ill. App.3d 438, 439-40, 444, 127 Ill.Dec. 586, 533 N.E.2d 458 (1988) (no showing of a causal relationship between officer's stress and his police duties, where he argued he was no longer having fun as a police officer, he could no longer deal with the public's negative response, and he was frustrated over the lack of advancement in his career); Olson v. City of Wheaton Police Pension Board, 153 Ill.App.3d 595, 599, 106 Ill.Dec. 596, 505 N.E.2d 1387 (1987) (stress did not result from an act of duty unique to police work where the officer's stress was caused by differences in management style with his superior, the fact that charges were brought against him, and the fact that he was assigned as a patrol officer although he had attained the rank of sergeant).
In contrast, the court in Knight v. Village of Bartlett, 338 Ill.App.3d 892, 905, 272 Ill.Dec. 901, 788 N.E.2d 205 (2003), reversed the board's denial of the officer's duty-related disability pension. The court found the officer's disability was a direct result of his participation in undercover drug-buy operations during a two-year assignment. As an undercover officer, his life was often threatened, and a high percentage of the arrests made by the officer involved physical struggles. Prior to that assignment, he served as a deputy sheriff and patrolman for more than 20 years without incident. Three of the four doctors who examined the officer opined that his psychological problems were duty-related. Knight, 338 Ill.App.3d at 905, 272 Ill.Dec. 901, 788 N.E.2d 205. The court held the officer's disability was "`incurred in or resulted from the performance of an act of police duty,'" and the board's findings to the contrary were against the manifest weight of the evidence. Knight, 338 Ill.App.3d at 905, 272 Ill.Dec. 901, 788 N.E.2d 205.
In Alm v. Lincolnshire Police Pension Board, 352 Ill.App.3d 595, 602, 287 Ill.Dec. 627, 816 N.E.2d 389 (2004), the court held the officer pedaling a bicycle while on patrol was an "act of duty" within the meaning of the pension statute. The officer sustained a knee injury from riding the bicycle. The pension board had awarded the officer a non-duty disability pension because pedaling a bicycle did not involve any special risk. Alm, 352 Ill.App.3d at 597, 287 Ill.Dec. 627, 816 N.E.2d 389. The board's finding was reversed.
The court noted the Illinois Supreme Court expressly rejected a narrow interpretation of "special risk" encompassing only inherently dangerous activities. Alm, 352 Ill.App.3d at 599, 287 Ill.Dec. 627, 816 N.E.2d 389, citing Johnson v. Retirement Board of the Policemen's Annuity & Benefit Fund, 114 Ill.2d 518, 521, 104 Ill.Dec. 221, 502 N.E.2d 718 (1986). The focus is on the capacity in which the officer is acting, rather than the precise mechanism *187 of injury. Alm, 352 Ill.App.3d at 599, 287 Ill.Dec. 627, 816 N.E.2d 389, citing Johnson, 114 Ill.2d at 522, 104 Ill.Dec. 221, 502 N.E.2d 718. Whether an officer has discretion to perform an act also is relevant. Alm, 352 Ill.App.3d at 602, 287 Ill.Dec. 627, 816 N.E.2d 389.
The court found Alm's pedaling of the bicycle was an act of duty because Alm faced risks not ordinarily encountered by civilians. Alm, 352 Ill.App.3d at 601, 287 Ill.Dec. 627, 816 N.E.2d 389. He was required to ride his bike at night over varying terrain, carrying a significant amount of additional weight, guarding his personal safety while also performing his patrol duties. Alm, 352 Ill.App.3d at 601, 287 Ill.Dec. 627, 816 N.E.2d 389. Under such conditions, Alm faced the risk of falls, collisions, and "dangerous encounters with the unsavory elements of society." His duties had "no clear counterpart in civilian life." Alm, 352 Ill.App.3d at 601, 287 Ill.Dec. 627, 816 N.E.2d 389. See also Johnson, 114 Ill.2d at 522-23, 104 Ill.Dec. 221, 502 N.E.2d 718 (officer injured while crossing the street in response to a citizen requesting assistance was performing an act of duty).
Hare testified his panic attacks began in 1996 when he was doing undercover narcotics work. He testified his interactions with the chief of police caused further attacks and caused his condition to worsen. He described incidents in which the chief told him to ignore missing evidence, advised him to discontinue his investigation of a rape case, and initiated an investigation of Hare. Hare's testimony was supported by the three doctors' reports. Unlike some of the cases relied on by the Village, all three doctors who examined Hare opined that his disability was duty-related. See, e.g., Ryndak, 248 Ill.App.3d at 490, 188 Ill.Dec. 36, 618 N.E.2d 606 (Of the four psychiatrists to render an opinion, the only one to discuss a causal connection between Ryndak's employment and his disability specifically said Ryndak's disability was not caused by an act of police service); Wall, 178 Ill.App.3d at 443, 127 Ill.Dec. 586, 533 N.E.2d 458 (None of the four examining doctors would speculate whether Wall's stress was job-related).
The Village contends Hare's statement that "everything that's happening to me is a direct result of my boss, not because of anything else," shows the stress that Hare experienced arose not from the specific incidents of police work, but from his interactions with the police chief. We believe Hare's comment must be taken in context with the events that gave rise to it. The interactions with Zitek occurred in the context of Hare's police duties, i.e., managing evidence, investigating crimes, and conducting undercover operations.
There was sufficient evidence to show Hare's particular duties were unique to police work and "not ordinarily assumed by a citizen in the ordinary walks of life." Robbins, 177 Ill.2d at 543, 227 Ill.Dec. 116, 687 N.E.2d 39. Although "civilians regularly suffer stress in their employment resulting from conflicts with their superiors," Olson, 153 Ill.App.3d at 599, 106 Ill.Dec. 596, 505 N.E.2d 1387, ordinary citizens do not engage in undercover narcotics transactions, are not responsible for the preservation of evidence such as drugs and weapons, and do not investigate rape charges. As in Alm, Hare "faced risks not ordinarily encountered by civilians" in the performance of his duties. Alm, 352 Ill. App.3d at 601, 287 Ill.Dec. 627, 816 N.E.2d 389.
We find the Board's decision granting Hare a duty-related disability pension was not against the manifest weight of the evidence. Our review of the record shows the Board's decision was reasonable and adequately supported by the *188 evidence. A reviewing court does not weigh the evidence or substitute its judgment for that of the administrative agency. Belvidere, 181 Ill.2d at 205, 229 Ill.Dec. 522, 692 N.E.2d 295; Ryndak, 248 Ill. App.3d at 489-90, 188 Ill.Dec. 36, 618 N.E.2d 606. If the record contains evidence that supports the agency's decision, that decision should be upheld. Abrahamson, 153 Ill.2d at 88, 180 Ill.Dec. 34, 606 N.E.2d 1111. Although the Board reasonably could have come to the opposite conclusion based on this record, the mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings. DeCastris v. State Employees Retirement System of Illinois, 288 Ill.App.3d 136, 143, 223 Ill.Dec. 374, 679 N.E.2d 825 (1997). The Village has not cited, nor have we found, any Illinois case in which a board's decision to award an officer a duty-related disability pension was overturned on appeal.

CONCLUSION
We affirm the judgment of the circuit court denying the Village's complaint for administrative review.
Affirmed.
GARCIA, P.J., and SOUTH, J., concur.