FIRST DIVISION

September 19, 2005

Nos. 1-04-1725 & 1-04-2390 cons.

ANTHONY MARCONI
, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, )    Cook County.

)    

v. )   Nos. 02 CH 04584 & 02 CH 213000     

)

CHICAGO HEIGHTS POLICE PENSION )

BOARD,
 
 ) Honorable

) David R. Donnersberger,

Defendant-Appellee. 
 ) Judge Presiding.

JUSTICE GORDON delivered the opinion of the court:

This consolidated appeal stems from an application for a disability pension 
that plaintiff Anthony Marconi, a police officer, filed with defendant Chicago Heights Police Pension Board (the Pension Board).  During the pendency of the Pension Board's review of his application, Marconi brought an action for declaratory judgment, 
mandamus
 and other relief (the declaratory action), alleging that the Pension Board did not complete its review of his application in a timely manner.  While the declaratory action was pending before the circuit court, the Pension Board rendered its final decision denying Marconi a disability pension.  Marconi sought administrative review.  The circuit court affirmed the Pension Board's decision to deny Marconi a disability pension.  Shortly thereafter, the circuit court granted summary judgment in the declaratory action
 in favor of the Pension Board.  

The administrative review portion of this appeal is chiefly concerned with whether the Pension Board erred in denying Marconi's application for a disability pension, given the evidence presented.  However, as shall be discussed more fully below, a decision to reverse the Pension Board's determination on that ground would further implicate the constitutionality of section 3-115 of the Illinois Pension Code (the Pension Code) (40 ILCS 5/3-115 (West 2002)), which on its face would support the denial of a disability pension on a "precertification" ground—namely, that the three doctors chosen by the Pension Board did not unanimously certify Marconi as disabled
.

For the reasons that follow, we reverse the affirmance of the Pension Board's decision to deny Marconi a disability pension and remand the matter to the Pension Board for further proceedings consistent with this opinion; however, we affirm the grant of summary judgment in the declaratory action.

BACKGROUND

I.  
Procedural History

On April 22, 1997, Marconi
(footnote: 1) wrote to the Pension Board, notifying it of his formal request for a duty-related disability pension.  Marconi also asked the Pension Board to inform him if a formal application needed to be submitted.  

In a letter dated April 30, 1997, the Pension Board acknowledged the receipt of Marconi's letter and treated it as an application for disability pension benefits.  The Pension Board requested that Marconi submit a written statement detailing his illness or injury, together with supporting documentation.  The Pension Board also informed Marconi that he was required to be examined by three physicians selected by it, and he would be notified of the date, time and location of those examinations.  The Pension Board would schedule the matter for a hearing after the completion of all examinations and the receipt of the medical reports.  

In a letter dated September 24, 1997, Marconi stated that he was involved in multiple shootings while on the job, and those incidents greatly contributed to his disability.  
Marconi further stated that it was the police department's own psychiatrist, Dr. Carl Wahlstrom, who recommended that he not return to work as a police officer, and that he was still receiving psychiatric care from Dr. Wahlstrom.  Lastly, Marconi requested a prompt hearing because his temporary disability benefits had run out and he was no longer receiving a paycheck.  Subsequently, in a letter dated November 12, 1997, Marconi provided the Pension Board with the information that would help it locate the police reports of the shooting incidents he referred to in his earlier correspondence.

Marconi's psychiatric and psychological evaluations scheduled by the Pension Board were conducted on June 30, 1998; July 6, 1998; July 7, 1998; November 20, 1998; and December 10, 1998.

The Pension Board did not hold its first hearing on Marconi's application until September 2, 1999.  The Pension Board admitted certain exhibits into evidence so that they could be reviewed by its members prior to the next hearing and adjourned.  These exhibits included pertinent personnel records and the reports of the two psychiatrists and one psychologist selected by the Pension Board who evaluated Marconi's condition.  The next hearing was scheduled for October 4, 1999.

The next time the Pension Board reconvened was on June 11, 2001.  It heard
 Marconi's testimony and admitted into evidence Dr. Wahlstrom's deposition.  The Pension Board then adjourned.  As is noted below, it did not reconvene for another year.

On March 1, 2002, Marconi filed the declaratory action.  Marconi asserted that he had waited almost five years for the decision on his application for pension benefits.  
In count I of his complaint, captioned "Due Process—Section 1983 [(42 U.S.C. §1983 (2000))]," Marconi sought: a declaratory judgment that the Pension Board had "violated [his] due process rights *** by not affording him disability benefits and/or a hearing on his application for benefits"; "a [w]rit of [m]andamus requiring [the Pension Board] to begin paying [him] line of duty disability benefits with back benefits to his last day of pay and statutory interest as required by law"; an award of "any actual damages he has suffered as a result [of the Pension Board's] refusal to provide disability benefits and/or hearing on his application"; and attorney fees and costs.
  In a mostly duplicative count II of his complaint, captioned "Declaratory Judgment and Mandamus," Marconi again sought a declaratory judgment that the Pension Board had "violated [his] due process rights *** by not affording him disability benefits and/or a hearing on his application for benefits"; and "a [w]rit of [m]andamus requiring [the Pension Board] to begin paying [him] line of duty disability benefits with back benefits to his last day of pay and statutory interest as required by law."  It appears that the only difference between count I and count II was that count I was based on the federal due process violations and count II was based on Illinois law.

While the declaratory action was pending, finally, after extended delays totaling some three years from the date of the first hearing, the Pension Board reconvened and held further hearings on August 26, 2002, September 16, 2002, and October 23, 2002.  The Pension Board admitted 
additional exhibits into evidence and heard the testimony of several witnesses.  On October 23, 2002, the Pension Board issued its decision denying Marconi's application for pension benefits.  On November 25, 2002, Marconi filed a petition for administrative review of the Pension Board's decision.  Marconi's declaratory action, however, remained pending in the circuit court.  

On June 10, 2003, the Pension Board moved for summary judgment in the declaratory action
 on the grounds that count I was filed after the applicable statute of limitations; count II was moot because the hearings on the matter had concluded; and, in the alternative, the Pension Board was immune from the suit because the it acted in an adjudicative capacity.

On January 22, 2004, in the administrative review action, 
the circuit court affirmed the Pension Board's decision 
on the grounds that although Marconi was evaluated by more than three mental health professionals, he failed to submit three certificates of disability required under section 3-115 of the Pension Code (40 ILCS 5/3-115 (West 2002)).  On February 5, 2004, upon Marconi's motion, the circuit court reconsidered its order and remanded the matter to allow Marconi to submit additional certificates of disability and for the Pension Board to reconsider its decision based upon that additional evidence. 

Subsequently, Marconi submitted to the Pension Board two additional certificates of disability.  On April 2, 2004,
 the Pension Board issued its amended decision, again denying Marconi's 
application for pension benefits.

On May 20, 2004, the circuit court affirmed the Pension Board's decision as not against the manifest weight of the evidence.  On July 26, 2004, in the declaratory action, the circuit court granted the Pension Board's motion for summary judgment.  Both circuit court's orders were timely appealed
, and the appeals were consolidated in this court.

II.  
Evidence Considered by the Pension Board

Nonexpert Testimony

Marconi testified before the Pension Board as follows.  He was hired as a patrol officer by the City of Chicago Heights in 1988.  When Marconi was still new on the job, he was involved in a "shots fired" situation.  One of the burglary suspects whom Marconi and his partner tried to apprehend struck Marconi's partner with a tree branch; at that point, Marconi's partner shot the suspect.  When the suspect was shot, he was standing between Marconi and his partner.  After the incident, Marconi felt that the shot meant for the suspect could have hit him in the chest and killed him.

At the end of 1994 or beginning of 1995, Marconi was reassigned to the canine unit.  In the spring of 1995, Marconi was involved in another "shots fired" situation.  He was chasing a speeding car.  After the car ran into a ditch, two individuals got out and started shooting.  Marconi ran for cover.  Although was not hit by the shots, he injured his shoulder when he bumped it against his squad car.  Afterwards, the police department conducted an investigation.  Marconi later learned that spent casings were found at the scene.  The shooters were never apprehended.

About three to five months later, Marconi was involved in a third "shots fired" situation.  While responding to a dispatch about suspicious vehicles, Marconi heard shots being fired.  He observed two vehicles speeding towards him and someone shooting in his direction from a block away.  One vehicle pulled up to his squad car and its occupants told him that someone was shooting at them and blew out their back window.  Marconi and his partner were unable to apprehend the shooter.  Both of the vehicles involved were recovered by the police.  One of the vehicles had bullet holes in the trunk and its back window was blown out.

The next "shots fired" incident occurred in early 1996.  Marconi was on routine patrol.  He observed a group of men standing in front of what he believed to be a Gangster Disciples' house.  Marconi got out of the squad car, approached one of the men and reached out to grab him by the shoulder.  At that time, someone started shooting in the direction of the house.  Everybody ducked.  Marconi later found out that the man whom he attempted to grab was shot in the torso.  The next day, the police apprehended the shooter.  Marconi was very bothered by such a close call and so told his sergeant.

According to Marconi, prior to June of 1996
, he had no psychological problems and had not undergone a psychological or psychiatric treatment.  In June of 1996, two fellow police officers overheard Marconi make a remark about committing suicide and so informed the police chief.  The police chief sent Marconi to see Dr. Wahlstrom for a psychiatric evaluation.  Dr. Wahlstrom conducted an evaluation and sent Marconi back to work without prescribing any medications or recommending any psychotherapy or counseling.  In July of 1996, the police chief sent Marconi back to Dr. Wahlstrom.  Dr. Wahlstrom told Marconi that the reasons for the follow-up were his deteriorating work performance and his apparent depression.  Dr. Wahlstrom prescribed three medications for Marconi to take—trazodone, Depakote and clozapine—and returned him to duty.  In addition, Marconi was to participate in twice-weekly therapy with Dr. Wahlstrom.

For the next year, Marconi continued to take the medications and see Dr. Wahlstrom twice a week for therapy.  At some point during that time, upon Dr. Wahlstrom's recommendation, Marconi 
was removed from duty and placed on disability leave.
(footnote: 2)  At the time Marconi was placed on disability leave, he did not want to be around people; lashed out at his family and colleagues; gained 45 pounds; gave up his hobbies; and could not sleep at night.  In addition, Marconi stated that, around the time he was removed from duty, he was under surveillance by the FBI, which was investigating allegations of corruption at the Chicago Heights police department, and he also was audited by the IRS.
  Marconi remarked that some of his friends were indicted as a result of the FBI investigation and went to prison. 
 The FBI investigation and the IRS audit contributed to Marconi's psychological and psychiatric problems. 

Marconi received disability benefits for a year.  After his disability benefits ran out, he experienced financial problems and lost his house.  

Several police officers were called to testify about the "shots fired" incidents testified to earlier by Marconi.  Bryan Howard, a detective with the Chicago Heights police department, partially corroborated Marconi's account about the first shooting incident in stating that the burglary suspect struck him (Howard) with a stick and caused his weapon to discharge.  The bullet hit the suspect in the hand.  However, according to Howard, Marconi was not in the line of fire and was not standing between Howard and the suspect.  Rather, Howard stated that Marconi was elsewhere at the scene, and it took him between 20 and 30 seconds to respond to the shooting.  Howard did not hear Marconi say to anyone that he almost got shot.

Frank Cole, a retired Chicago Heights police officer, also testified.  Cole's testimony about the car-chase shooting incident contradicted Marconi's.  Cole stated that when he and Marconi caught up to the car, it was empty.  The driver and the occupant of the car had already fled.  Cole started to inspect the car, while Marconi walked down an embankment to search for the suspects.  Around the time Marconi came back up the embankment, both officers heard shots fired.  According to Cole, 
the shots came from about three or four blocks away.  Cole did not observe anyone shooting in Marconi's or his direction.

Robert Price, a K-9 officer with the Park Forest police department, also testified about 
the car-chase shooting incident.  His testimony contradicted Cole's and corroborated Marconi's.  Price stated that he responded to a call of shots fired and met with Marconi.  Marconi told him that the occupants of the vehicle he was chasing had fired several shots at him.  Price checked around the vehicle and found shell casings on the ground.  He and his dog tried to track down the suspects, but were unsuccessful.  Price spoke with some neighborhood residents who told him that they had seen several individuals run by.  Price also remembered Cole being at the scene.

Admitted into evidence was Price's police report, filed on September 17, 1994, which was consistent with his testimony.  Also, corroborating Marconi's and Price's testimony, was a Chicago Heights police report admitted into evidence.  The report, dated September 17, 1994, and signed by Sergeant M. Camill, referred to Chicago Heights police officers responding to a radio transmission of shots being fired at an officer who was in pursuit of a stolen auto at the location at issue.  Lastly, admitted into evidence was a Cook County sheriff's police department's evidence report dated September 17, 1994, which stated that Sergeant Brink of the Chicago Heights police department requested assistance in an attempted murder investigation of police officers Cole and "Manconi [
sic
]."  The report further stated that the sheriff's department "was advised by Sergeant Brink that the above police officers had made a traffic stop on an auto that they believed had been stolen and that the occupants of the auto exited and began firing at the officers."  Among the evidence collected at the scene and from the vehicle were two expended cartridges from .45 Auto and 9 millimeter Luger caliber weapons. 

Finally, Michael Leuser, a Chicago Heights police sergeant, testified about a "shots fired" incident involving suspicious vehicles.  He corroborated Marconi's testimony that a vehicle pulled up to their squad car and the vehicle's occupants told the officers that someone was shooting at them.  The vehicle's rear window was blown out.  Leuser and Marconi drove to investigate and heard shots being fired in their direction.    

Medical Testimony and Reports

At the hearing, Marconi submitted the evidence deposition of Dr. Wahlstrom.  Dr. Wahlstrom's deposition testimony corroborated Marconi's testimony in many respects.  Dr. Wahlstrom testified as follows.  He was a general and forensic psychiatrist who treated Marconi for several years.  Marconi first came to see Dr. Wahlstrom in February of 1996
 at the request of the police chief.  The police chief was concerned that Marconi had made suicidal threats and wanted Dr. Wahlstrom to evaluate whether Marconi was a danger to himself and in need of mental health treatment.  In the course of the initial evaluation, Marconi admitted to having had thoughts and having made statements about committing suicide, but stated that he no longer felt suicidal.  Marconi reported no previous psychiatric treatments or hospitalizations.  After completing his evaluation, Dr. Wahlstrom reported to the police chief that Marconi could resume his regular duties.

Dr. Wahlstrom next evaluated Marconi in July of 1996, again, at the request of the police chief.  The police chief, who described Marconi as one of her best officers, was concerned about the hostility he exhibited towards others and questioned his fitness for duty.  In the course of this evaluation, Dr. Wahlstrom met with Marconi three times, spoke with the chief of police several times, and also spoke with Marconi's girlfriend of many years.  Dr. Wahlstrom concluded that Marconi was suffering from a major depression and stress related to work and outside life circumstances.  Dr. Wahlstrom noted that the stressors that contributed to Marconi's condition included shooting incidents on the job and a massive FBI investigation of the Chicago Heights police department.  At that time, Dr. Wahlstrom found that Marconi was not so disabled that he would be a danger to himself or others and Marconi was fit to return to duty, provided that he began psychotherapy and cooperated with all medical treatment recommendations.

The police department made arrangements for Marconi to receive treatment from Dr. Wahlstrom.  Marconi began twice-weekly psychotherapy.  In addition, Dr. Wahlstrom prescribed three medications—an antidepressant, an anti-anxiety medication and a mood-stabilizing medication
.  Marconi's condition, nevertheless, continued to deteriorate.  On September 9, 1996, Dr. Wahlstrom wrote to the police chief that Marconi was making direct physical threats against her and seemed not to be able to exercise good judgment with relation to her.
(footnote: 3)  In that letter, which was admitted into evidence, Dr. Wahlstrom further stated that Marconi's "perceptions related to his work environment [were] deteriorating and unstable."  Dr. Wahlstrom thus found that Marconi was disabled by his condition and concluded that Marconi was unfit for duty.  To Dr. Wahlstrom's knowledge, in September of 1996, Marconi was suspended from active duty.  Dr. Wahlstrom did not initially complete a certificate of disability.  Subsequently, in February of 2004, Dr. Wahlstrom
 certified that Marconi was disabled.

Dr. Harley Rubens, who conducted a psychiatric evaluation of Marconi on 
June 30, 1998
, stated in his report the following.  In addition to interviewing Marconi, Dr. Rubens reviewed correspondence from Marconi's attorney, a list of incidents involving Marconi, pertinent police reports from the Chicago Heights police department, and letters as well as progress notes from Dr. Wahlstrom.  Marconi's past history as told to Dr. Rubens was generally consistent with Marconi's testimony before the Pension Board.  Dr. Rubens noted that Marconi made racist remarks about African-Americans.  Marconi explained that his animosity towards African-Americans stemmed from multiple incidents involving African-American offenders.  Dr. Rubens additionally noted that Marconi stated that he feared he might shoot an innocent person if he went back to work as a police officer.  In this regard, Dr. Rubens noted that despite the fears of what he might do, Marconi carried a gun with him.
(footnote: 4)
 Dr. Rubens diagnosed Marconi with a "[m]ajor depression by history, resolved"; an "[a]cute stress disorder in the past, resolved"; an "[a]djustment disorder with mixed anxiety and depression"; and a "[p]ersonality [d]isorder NOS," and certified that Marconi was disabled.
  In his summary, Dr. Rubens stated:

"Officer Marconi underwent traumatic situations while working in the Chicago Heights Police Department.  He was in situations where his life was endangered.  The authority figures that he trusted did not look after his best interests, by his account.  The patient underwent a severe stress reaction at the last shooting.  The patient currently experiences resentments over having had financial losses during the period when he was not allowed to work.  He also is angered by the fact that nobody listened to him and provided backup support for him.  These are his perceptions.  The patient has a history of acting impulsively and later regretting it.

***  Because of his Personality Disorder, which existed long before the events of the shootings, it is possible that Officer Marconi, if he were to return to police work, might do something foolish to prove the point that he is too infirm and too damaged to be a police officer.  

***  Officer Marconi is disabled for full-unrestricted duties in the police department as a result of a psychological disability.  The disability would be the Adjustment Disorder in response to being in a situation that he no longer likes or enjoys, and his preexisting Personality Disorder.  The cause of the disability would be two fold.  One of the causes, most certainly, is the job duty of a police officer not shared by ordinary citizens.  The situations are those when he was shot at four times.  Additionally during his police work there is a clear description of having been greatly disappointed by the people who have been in higher positions and responsible for his safety and well being.  The other cause, however, is Mr. Marconi's preexistent Personality Disorder, which may lead his to act impulsively in possibly dangerous ways."  (Emphasis omitted.)

Similarly, Dr. Henry Conroe, who conducted a psychiatric evaluation of Marconi on 
July 6, 1998
, certified in his report that Marconi was disabled.  In addition to interviewing Marconi, Dr. Conroe spoke with Dr. Wahlstrom and reviewed a number of documents, including a letter to the Pension Board from Marconi's attorney, a letter to the police chief from Dr. Wahlstrom, Marconi's personnel and medical records, and police reports of the shooting incidents.  
The incidents Marconi recounted to Dr. Conroe were consistent with his testimony before the Pension Board and his statements to Dr. Rubens.  Dr. Conroe also noted Marconi's use of racial epithets and his animosity towards African-Americans.  In addition, Dr. Conroe noted that Marconi carried a gun everywhere with him because he did not trust anyone.  Dr. Conroe summarized his assessment of Marconi's condition as follows:

"[W]ith reasonable degree of psychiatric certainty, Officer Anthony Marconi is disabled for the full unrestricted duties in a police department due to the psychiatric disability caused by a Major Depressive Episode in Partial Remission.  The most incapacitating residual symptom is the continuing irritability with homicidal ideation.  As a result, his ability to interact safely with the public and to respond appropriately to the demands of the job would be severely impaired.  His capacity to work with supervisors and co-workers would be significantly limited.  These manifestations of his mood disorder remain despite active treatment with both medications and psychotherapy.  I do not foresee that additional treatment would allow him to resume full unrestricted police duties.

***

In my opinion, the disability was to a large degree caused by the unique job duties of a police officer not shared by an ordinary citizen. *** [T]he major stressors were the disillusionment relating to the [FBI] investigation of prominent Chicago Heights officials and their convictions for corruption and the shooting incidents while on duty."

A similar conclusion was reached by Dr. Ronald Ganellen, who conducted Marconi's psychological evaluation on December 10, 1998
.  Marconi's account of his past history was generally consistent with his statements to Dr. Rubens, Dr. Conroe, as well as with his testimony before the Pension Board.  Like other evaluators, Dr. Ganellen also noted Marconi's animosity towards African-Americans and his use of racial slurs.  Dr. Ganellen further noted that Marconi carried a gun with him and, by his admission, slept with the gun by his side.  In addition to interviewing Marconi and administering several psychological tests, Dr. Ganellen reviewed Dr. Wahlstrom's notes.  In summarizing his findings, Dr. Gannellen stated:

"The evaluation overall indicates that Mr. Marconi's psychiatric difficulties involve[] paranoid features, such as his conviction that the police chief was deliberately trying to hurt, embarrass, or humiliate him, his angry, resentful responses, and his focus on blacks as presenting a significant threat.  Although paranoid symptoms can occur as part of a mood disorder, such as depression, these symptoms typically decrease as the mood disorder resolves.  In Mr. Marconi's case, the paranoid features have persisted although the depression has improved considerably.  This indicates that the paranoid features and mood disorder are two, independent psychiatric conditions.

These difficulties do not appear to be directly related to the incidents at work Mr. Marconi described when he was shot at. ***

In my opinion, Mr. Marconi is not able to return to work as a police officer at the present time as he may present a risk to public safety as well as to his own safety."

Dr. Ganellen did not initially complete a certificate of disability.  Subsequently, in February of 2004, Dr. Ganellen certified that Marconi was disabled at the time of his evaluation.

On the other hand, Dr. Richard Harris, who conducted a psychiatric evaluation of Marconi on 
July 7, 1998
, and November 20, 1998, reached the opposite conclusion.  Dr. Harris certified that Marconi was not disabled.  In addition to interviewing Marconi, Dr. Harris relied on the pertinent personnel records; Dr. Wahlstrom's notes and letters; a phone conversation with Dr. Wahlstrom; a phone conversation with the police chief; 
police reports of the shooting incidents; and a phone conversation with Marconi's long-time girlfriend.  Dr. Harris questioned the overall credibility of Marconi's account due to "many inconsistencies of his story."  Dr. Harris further stated that "[t]here is no clear evidence to support the claim of a duty-related disability presumably caused by the effects of five shooting incidents."  In addition, Dr. Harris 
felt that Marconi was trying to manipulate him into accepting his disability.  Dr. Harris also questioned Dr. Wahlstrom's assessment that Marconi could not return to work because of his potential for violence, stating:

"[Dr. Wahlstrom] apparently did not seem too concerned about Officer Marconi carrying a gun during the height of his purported dangerousness.  An individual who is so unstable should not be carrying a gun.  I believe Dr. Wahlstrom's tolerance and/or implicit approval of the gun carrying behavior is one indication that Officer Marconi was not suffering from a severe or even moderate psychiatric disturbance characterized in part by barely controlled aggressiveness."

In his report, Dr. Harris further stated:

"I doubt [Marconi] was a totally disabled individual for the year he was on [temporary] disability ***.  He should have been working and I am certain [that] part of any emotional distress he experienced during that time was due to not doing anything productive.  He has always been an active and industrious person.  Idleness is detrimental to his well being as it is to many people.

*** I don't think he is a violent and unstable person.

*** At this time there is no evidence that Officer Marconi is suffering from a psychiatric disorder."

However, Dr. Harris had also stated in his report:

"Given that [Marconi] had a clear psychiatric disturbance warranting time off from work, he had a full year of paid [temporary] disability.  This time off resulted in the reduction of his angry feelings towards the chief.  It was the threat to the chief that prompted the medical leave from work.  He has had sufficient time to recover from the acute problems he experienced in July-September 1996.  He is no longer suffering from psychiatric disability."

In sum, although Dr. Harris
 concluded that at the time of the evaluation
 Marconi was no longer suffering from a psychiatric impairment that rendered him unable to function as a police officer, he acknowledged that Marconi at one time "had a clear psychiatric disturbance[
(footnote: 5)] warranting time off from work" and experienced "acute problems" in July through September of 1996.  In Dr. Harris' opinion, Marconi's "psychiatric impairment that resulted in medical leave from work ended as far back as, and most likely well before 10/6/97."

III.  
The Pension Board's Amended Decision

The Pension Board first explained: 

"The delay in hearing this case was not the result of any animus of the Board for [Marconi], but rather resulted from a combination of unfortunate factors, including a misunderstanding that [Marconi] had abandoned his application and the Board's inability to communicate promptly with its former attorneys."

The Pension Board found that Marconi's testimony with respect to the shooting incidents was rebutted by the testimony of other witnesses and, overall, found most of Marconi's testimony not credible.  The Pension Board did find "considerably troubling" Marconi's frequent use of racial slurs during the evaluations and his animosity towards African-Americans, especially given that the City of Chicago Heights had a significant population of African-Americans.  In this respect, the Pension Board stated:

"There is little, if any, testimony that Marconi used the [racial slurs] in normal parlance as an officer.  If he did, he would doubtless have been subject to severe discipline and this case would never have arrived before us.  There is some evidence in the record that his relationships with African-Americans were normal. ***  The Board must consider why Marconi would feel free to laden his psychological interviews with the constant use of [racial slurs].  Marconi knew he was being examined to determine if he suffered from a psychological disability.  Given his self-interest in achieving a favorable report, it seems that Marconi was using it to alarm the examining physicians into believing he suffered from a psychological impairment of the basis that only such a disabled person would use the [racial slurs] so often in such a professional setting.

*** [A]nother motivation could be to coerce this Board into granting a pension so that Marconi would not be able to subject the City to possible liability, or to subject this Board to the unfavorable publicity of 'putting a bigoted officer back on the street.' "

With respect to the question of Marconi's psychological disability, the Pension Board found Dr. Harris' report to be the most thorough of the medical reports and "the most credible and persuasive evaluation," providing the most complete assessment of Marconi's condition, and assigned it "great weight."
  According to the Pension Board, "Dr. Harris' report indicate[d] that Marconi manufactured a blend of behavior and statements in order to obtain a disability pension that he was not entitled to."  The Pension Board further found: 

"At worst, Marconi has concocted an aggressively bigoted persona and symptoms of a psychological disorder to convince doctors that he [could not] perform the duties of a police officer.  At best, it seems, Marconi has some impediments, but medical practitioners simply cannot agree if they rise to the level necessary to qualify for a disability award under the Pension Code.  In either case, awarding Marconi a pension would violate this Board's fiduciary responsibility to the fund participants."  

The Pension Board, accordingly, determined that Marconi was not eligible for a disability pension.

ANALYSIS

Administrative Review

On appeal, we review the administrative agency's decision and not the circuit court's determination.  
Anderson v. Department of Professional Regulation
, 348 Ill. App. 3d 554, 560, 
810 N.E.2d 228, 233
 (2004).  
Judicial review of the decision of the Pension Board is governed by the Administrative Review Law (735 ILCS 5/3-101 
et seq
. (West 2002)).  40 ILCS 5/3-148 (West 2002); 
Robbins v. Board of Trustees of the Carbondale Police Pension Fund
, 177 Ill. 2d 533, 537, 
687 N.E.2d 39, 42
 (1997).  
"The applicable standard of review, which determines the degree of deference given to the agency's decision, depends upon whether the question presented is one of fact, one of law, or a mixed question of law and fact."  
AFM Messenger Service, Inc. v. Department of Employment Security
, 198 Ill. 2d 380, 390, 763 N.E.2d 272, 279
 (2001)
.  The factual findings of the administrative agency are considered to be 
prima facie 
correct and will be reversed only if against the manifest weight of the evidence.  735 ILCS 5/3-110 (West 2002); 
Antonelli v. Board of Trustees of the Hillside Police Pension Board
, 287 Ill. App. 3d 348, 353, 
678 N.E.2d 773, 776
 
(1997). 
 
On the other hand
, questions of law are reviewed 
de novo
.  
MacDonald v. Board of Trustees of the Park Ridge Police Pension Fund
, 294 Ill. App. 3d 379, 382, 
690 N.E.2d 636, 639
 
(1998).

The question of  whether a police officer qualifies for a disability pension involves 
an examination of the legal effect of a given set of facts.  Such a mixed question of law and fact is reviewed under the clearly erroneous standard.  See 
AFM Messenger Service
, 198 Ill. 2d at 391-95, 763 N.E.2d at 279-82
; 
Knight v. Village of Bartlett
, 338 Ill. App. 3d 892, 898, 788 N.E.2d 205, 210 (2003)
 (the question of the police officer's eligibility for a disability pension presents a mixed question of law and fact and is reviewed under the clearly erroneous standard)
.
  The clearly erroneous standard of review is "between a manifest weight of the evidence standard and a 
de novo
 standard so as to provide some deference to the [agency's] experience and expertise."  
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d 191, 205, 692 N.E.2d 
295, 302
 (1998)
.
  
Although we must afford deference to the agency's experience and expertise
, we will reverse its decision " 'when although there is evidence to support it, [we are] *** left with the definite and firm conviction that a mistake has been committed.' "  
AFM Messenger Service
, 198 Ill. 2d at 393, 763 N.E.2d at 280-81
, quoting 
United States v. United States Gypsum Co.
, 333 U.S. 364, 395, 92 L. Ed. 
746, 766, 68 S. Ct. 525, 542
 (1948).
  

Marconi contends that the Pension Board erred in denying his application for a disability pension because the medical evidence unanimously established that he was disabled at the time he was suspended from active duty
 and placed on disability leave.

Section 3-114.1 of the Pension Code addresses the "[l]ine of duty" disability pension and provides, in pertinent part:

"If a police officer as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty, is found to be physically or mentally disabled for service in the police department, so as to render necessary his or her suspension or retirement from the police service, the police officer shall be entitled to a disability retirement pension ***."  40 ILCS 5/3-114.1(a) (West 2002).

In the alternative, pursuant to section 3-114.2 of the Pension Code, a police officer may be eligible for a "[n]ot on duty" disability pension:

"A police officer who becomes disabled as a result of any cause other than the performance of an act of duty, and who is found to be physically or mentally disabled so as to render necessary his or her suspension or retirement from police service in the police department, shall be entitled to a disability pension ***."  40 ILCS 5/3-114.2 (West 2002).

In considering the medical evidence regarding the police officer's fitness for duty
, the pension board must focus on the medical examinations given at or near the time of the officer's removal from active duty.  See 
Hahn v. Police Pension Fund of the City of Woodstock
, 138 Ill. App. 3d 206, 210, 485 N.E.2d 871, 874
 
(1985).  In 
Hahn
, this court explained:

"Inasmuch as [the Pension Code] requires the amount of disability pension to be determined as of the date of suspension of duty or retirement, it seems apparent that the fact of disability should also be considered as of that time."  
Hahn
, 138 Ill. App. 3d at 210, 485 N.E.2d at 874
.  

Thus, 
Hahn
 held that at the initial determination of eligibility for a pension, it is inappropriate to consider medical opinions obtained much later—such as eight or nine months after the officer's removal from duty—that indicated that the officer improved with therapy.  
Hahn
, 138 Ill. App. 3d at 210
-11, 485 N.E.2d at 874
-75.  Rather, such reports are properly considered as part of verification of continuing eligibility for a pension.  See 40 ILCS 5/3-115 (West 2002) ("[m]edical examination of a police officer retired for disability shall be made at least once each year prior to attainment of age 50, as verification of the continuance of disability for service as a police officer"); 
Martino v. Police Pension Board of the City of Des Plaines
, 331 Ill. App. 3d 975, 981, 772 N.E.2d 289, 294 (2002) (if a police officer recovers from disability, the pension board may revoke his disability pension).  

Here, Dr. Wahlstrom was the only psychiatrist to evaluate Marconi near the time of his removal from active duty in September of 1996
.  All other evaluations were conducted more than a year and a half later.  The Pension Board asserts that because none of its experts evaluated Marconi promptly, "all evaluations stand on a relatively equal footing."  As Marconi points out, to condone such delay in evaluations would be tantamount to condoning the denial of a disability pension to an applicant whose condition was not promptly evaluated due to the Pension Board's oversight or malfeasance.  In any event, all of the mental health professionals, including Dr. Harris, agreed that at the time of his removal from active duty Marconi was suffering from a psychiatric impairment that rendered him unable to function as a police officer
.  Under the authority of 
Hahn
, it was clearly erroneous for the Pension Board to deny Marconi a disability pension in the face of this evidence speaking to Marconi's condition at the time of his removal from active duty.
 

In further support of his position, Marconi relies on 
Knight
, which is also on point.  In 
Knight
, the police officer was examined by three mental health professionals he was referred to by the police department, as well as three psychiatrists selected by the pension board.  
Knight
, 338 Ill. App. 3d at 897, 899, 788 N.E.2d at 208-09, 210
.  As is the case here, two of the doctors selected by the pension board and a psychologist to whom the officer was referred by the police department found the officer disabled and submitted certificates of disability to that effect.
  
Knight
, 338 Ill. App. 3d at 897, 899-900, 788 N.E.2d at 208-09, 210
.  The one psychiatrist selected by the pension board who opined that the officer was not psychologically or psychiatrically disabled was Dr. Harris, the same expert as in the instant case. 
 
Knight
, 338 Ill. App. 3d at 897, 900, 788 N.E.2d at 209, 210
.
  Dr. Harris reached that conclusion despite his own finding that the officer had a " 'lack of fitness for duty' " in a sense that the officer was no longer capable of performing his police duties.  Dr. Harris stated that the " '[l]ack of fitness for duty and disability are not one and the same.' "  
Knight
, 338 Ill. App. 3d at 900, 788 N.E.2d at 211
.  As is the case here, the pension board relied heavily upon Dr. Harris' opinion and discounted the other expert opinions.  
The pension board concluded that the officer " 'suffer[ed] from a psychological problem related to employment issue' and had 'a severe personality disorder which made him unfit to return to duty as a police officer *** due to employment issues.' " 
 Despite its finding of unfitness for duty and its corresponding conclusion that the officer should not be returned to duty, the pension board denied the officer's application for a disability pension.
  
Knight
, 338 Ill. App. 3d at 901, 788 N.E.2d at 211-212
.  
Upon review, this court reversed the pension board's ruling as clearly erroneous
 because the pension board's own findings, as well as other evidence in the record, compelled a conclusion of disability.
  
Knight
, 338 Ill. App. 3d at 901-02, 788 N.E.2d at 212
. 

We agree with Marconi that 
Knight
 supports his position.  Here, as discussed, all of the mental health professionals, including Dr. Harris, agreed that at the time of his removal from active duty, Marconi was suffering from a psychiatric impairment that rendered him unable to function as a police officer
.  
This evidence, together with the rest of the record, as in 
Knight
, compels the conclusion that Marconi was unfit for duty at the time of his removal and, therefore, disabled.  Although the Pension Board asserts that Marconi's condition has subsequently improved, as discussed, this evidence is properly considered upon the review of his continuing eligibility for a disability pension, and not at the initial determination.  Nor are we persuaded by the Pension Board's assertion that nonmedical evidence in the instant case fails to support a claim of disability.  Marconi's own testimony of his impaired condition aside, we find it significant, as did this court in 
Knight
, that Marconi did not leave active duty on his own accord but, rather, was removed from active duty by his superiors at the police department.

The Pension Board urges us to follow the decision in 
Trettenero v. Police Pension Fund
, 333 Ill. App. 3d 792, 776 N.E.2d 840 (2002), instead of 
Knight
.  The Pension Board's reliance on 
Trettenero
 is misplaced.  We first note that unlike 
Hahn
 and 
Knight
, which addressed the initial eligibility for a disability pension, 
Trettenero
 addressed the termination of a disability pension.  
Trettenero
, 333 Ill. App. 3d at 794, 776 N.E.2d at 843
.  
In 
Trettenero
, at the request of the pension board, Dr. Harris (the same expert as in the instant case) evaluated the police officer.  Dr. Harris opined that the officer was no longer mentally disabled.  
Trettenero
, 333 Ill. App. 3d at 795, 776 N.E.2d at 844
. 
 
In addition to Dr. Harris' testimony and reports, the pension board considered expert evidence that contradicted Dr. Harris' opinion—specifically, the evaluations of a psychiatrist and the officer's treating physician, a psychologist, who opined that the officer continued to be mentally disabled.  
Trettenero
, 333 Ill. App. 3d at 795-96, 776 N.E.2d at 844
-45.  The pension board "placed great weight on the testimony of Dr. Harris" and found that the officer had fully recovered from disability.  
Trettenero
, 333 Ill. App. 3d at 797, 776 N.E.2d at 845
.

The court in 
Trettenero
 first upheld the statute providing that a disability pension may be terminated if only one doctor, after conducting a medical examination, concluded that the officer was no longer disabled.  
Trettenero
, 333 Ill. App. 3d at 799-800, 776 N.E.2d at 847-49
.  Having made that decision
, the court further found that there was sufficient evidence to uphold the pension board's finding that the officer's disability had terminated.  
Trettenero
, 333 Ill. App. 3d at 802, 776 N.E.2d at 850
.  Unlike in the instant case and unlike in 
Knight
, Dr. Harris' report was free of internal inconsistencies and, therefore, the pension board did not err in giving it more credit than the other two reports.  In this regard, we further note that in 
Trettenero
 one of the experts that contradicted Dr. Harris testified that there was no medical basis to conclude that his own opinion was 
any more medically correct than that of Dr. Harris.  The record also showed that the other expert, the officer's treating physician, did not address the question of the officer's disability during many of the treatment sessions, and there were significant breaks in the treatment.  
Trettenero
, 333 Ill. App. 3d at 802, 776 N.E.2d at 850
.  In contrast to 
Trettenero
, in the instant case, as in 
Knight
, all of the experts, including Dr. Harris, agreed that at the time of his removal from active duty, Marconi was suffering from a psychiatric impairment that rendered him unable to function as a police officer
.  Accordingly, as discussed, we are compelled to reverse the Pension Board's decision to deny Marconi as disability pension as clearly erroneous.

We must now, therefore, address the alternative argument of the Pension Board on appeal.  The Pension Board, in the alternative, argues that its decision must be affirmed pursuant to section 3-115's "three certifications" requirement.  Section 3-115 provides, in pertinent part:

"A disability pension shall not be paid unless there is filed with the board certificates of the police officer's disability, subscribed and sworn to by *** 3 practicing physicians 
selected by the board
."  (Emphasis added.)  40 ILCS 5/3-115 (West 2002).

As the Pension Board points out, although Marconi submitted four certificates of disability, Dr. Harris' certificate stated that Marconi was 
not 
disabled and, although Dr. Wahlstrom certified that Marconi was disabled, Dr. Wahlstrom was not one of the doctors selected by the Pension Board.  The Pension Board argues that because Dr. Harris, the third doctor selected by it, did not certify that Marconi was disabled, Marconi is not eligible for a disability pension because of his failure to comply with the requirements of section 3-115.  In support of the strict construction of section 3-115's certification requirement, the Pension Board relies on this district's decision in 
Rizzo v. Board of Trustees of the Village of Evergreen Park Police Pension Fund
, 338 Ill. App. 3d 490, 788 N.E.2d 1196 (2003).

In 
Rizzo
, this court stated:

"The plain and clear language of [section 3-115] requires that a police officer cannot obtain a disability pension unless the Board receives certificates stating that the officer is disabled from three practicing physicians who were selected by the Board.  ***

***

In the present case, one of the three physicians selected by the Board to examine [the officer] *** did not certify that he had a disability.  Based on section 3-115, without such certification, the Board could not award [the officer] a disability pension."  
Rizzo
, 338 Ill. App. 3d at 494-95, 788 N.E.2d at 1200
. 

As Marconi points out, the Third District's recent decision in 
Coyne v. Milan Police Pension Board
, 347 Ill. App. 3d 713, 807 N.E.2d 1276 (2004), disagrees with 
Rizzo
.  Coincidentally, in 
Coyne
, Dr. Harris was, again, the lone dissenter.  See 
Coyne
, 347 Ill. App. 3d at 720, 807 N.E.2d at 1281
.
  The court in 
Coyne
 stated:

"
We believe the Board's [strict] interpretation of section 3-115 yields a result that is both absurd and unconstitutional.  Although the Board adjudicated several issues other than the certificate requirement, such action was superfluous if the Board's interpretation of that requirement is carried to its logical conclusion. 
As a threshold matter
 in all cases, the three physicians specified in section 3-115 would each have to certify that the applicant was disabled ***.  The opinion of a lone minority dissenter like Doctor Harris (five contrary opinions notwithstanding) would 
ipso facto
 defeat a pension claim, thus rendering section 3-115 a virtual summary dismissal provision.  A pension board would have no use for an evidentiary hearing in such cases because, regardless of the weight of the claimant's evidence, and regardless of any credibility issues pertaining to the lone dissenting physician, the outcome of the case would be predetermined by the mere existence of a disagreement between witnesses.  We cannot believe the legislature would establish the adjudicatory process outlined in the Pension Code expecting that the process would be so easily precluded.
"  (Emphasis in original.)  
Coyne
, 347 Ill. App. 3d at 729, 807 N.E.2d at 1288-89
.
  

Coyne
, thus, rejected the literal construction of section 3-115's certification requirement, holding instead that section 3-115 requires the mere filing of three medical certificates "
addressing
 a claimant's disability status generally, regardless of the doctor's ultimate opinion [as to the disability]."  (Emphasis added.)  
Coyne
, 347 Ill. App. 3d at 728, 807 N.E.2d at 1288
.
  Under this construction, Marconi complied with the requirements of section 3-115 because Dr. Harris submitted a medical certificate to the Pension Board, albeit certifying that Marconi was not disabled. 

As the Pension Board points out, 
Coyne
 was criticized in the Second District's decision of 
Wade v. City of North Chicago Police Pension Board
, 353 Ill. App. 3d 852, 819 N.E.2d 1211 (2004), 
vacated by
 
Wade v. City of North Chicago Police Pension Board
, 215 Ill. 2d 620 (2005).  In 
Wade
, as in 
Coyne
, 
Rizzo
 and 
Knight
, and as in this case, only two of the three doctors selected by the pension board found the officer disabled and issued certificates of disability to that effect.  
Wade
, 353 Ill. App. 3d at 854, 819 N.E.2d at 1213
.  
The court in
 
Wade
 followed 
Rizzo
 and an earlier Fourth District decision in 
Daily v. Board of Trustees of the Police Pension Fund
, 251 Ill. App. 3d 119, 621 N.E.2d 986 (1993), which also adhered to the literal interpretation of section 3-115.  
Wade
, 353 Ill. App. 3d at 857-60, 819 N.E.2d at 1216-18
.  
Wade
 also discounted the authority of 
Knight
, where the matter was remanded to the pension board with the instructions to grant the officer a disability pension—despite the lack of unanimous concurrence among the three doctors chosen by the board
 as to the officer's disability (
Knight
, 338 Ill. App. 3d at 906
, 788 N.E.2d at 215
).  In distinguishing 
Knight
, 
Wade
 noted, among other things, that 
Knight
 neither addressed 
Rizzo
(footnote: 6) nor construed section 3-115.  
Wade
, 353 Ill. App. 3d at 861, 819 N.E.2d at 1219
.  Ultimately, the court in 
Wade
 affirmed the denial of a disability pension for failure to comply 
with the requirements of section 3-115 and did not consider the argument that the pension board erred in its determination that the officer had failed to prove his disability.  
Wade
, 353 Ill. App. 3d at 862, 819 N.E.2d at 1220
.  

While the instant case was pending on appeal, the supreme court issued a supervisory order in 
Wade
 
in light of its recent decision in 
Turcol v. Pension Board of Trustees of the Matteson Police Pension Fund
, 214 Ill. 2d 521, 828 N.E.2d 277 (2005)
.  See 
Wade v. City of North Chicago Police Pension Board
, 215 Ill. 2d 620 (2005)
.  The supreme court directed the Second District to vacate its judgment and resolve the issue of whether the pension board erred in its determination that the officer had not proven his disability.  See 
Wade
, 215 Ill. 2d 620
. 
 However, the ground for the supervisory order was not that 
Wade
's strict construction of section 3-115 was unconstitutional.  Rather, as the supreme court explained in 
Turcol
, 
it is proper for a reviewing court to engage in section 3-115 analysis only 
after 
deciding that the pension board erred in its determination that the officer failed to prove his or her disability
:

"[W]ere we to agree with the [strict] construction of section 3-115, we would then have to consider plaintiff's claim that section 3-115 is unconstitutional.  It is fundamental that courts should consider the constitutionality of a statute only when necessary to decide the case."  
Turcol
, 214 Ill. 2d at 524, 828 N.E.2d at 278
.

Ours is such a case.  We have already concluded that, from an evidentiary standpoint, the Pension Board's decision to deny Marconi a disability pension was clearly erroneous.  Consequently, our ultimate decision as to whether the Pension Board's ruling must, nevertheless, be affirmed turns on the construction of section 3-115 and 
the resolution of the constitutional concerns that are implicated.  In this regard our review is 
de novo
.  See 
Land v. Board of Education of the City of Chicago
, 202 Ill. 2d 414, 421, 781 N.E.2d 249, 254 (2002)
. 

In interpreting a statute, we must ascertain the legislative intent, which is found in the plain and ordinary meaning of the language used in the statute.  
Land
, 202 Ill. 2d at 421, 781 N.E.2d at 254
.  It is well established that where the statutory language is clear, we are to give that language effect without resorting to other aids of construction.  
Paris v. Feder
, 179 Ill. 2d 173, 177, 688 N.E.2d 137, 139
 
(1997).
  
Equally well established is the tenet that a statute capable of two interpretations should be given that which is reasonable and will not produce results that are either unconstitutional or "absurd, unjust, unreasonable or inconvenient."  
Collins v. Board of Trustees of Firemen's Annuity & Benefit Fund of Chicago
, 155 Ill. 2d 103, 110, 610 N.E.2d 1250, 1253 (1993); 
In re Loss
, 119 Ill. 2d 186, 194-95, 518 N.E.2d 981, 984
 
(1987).  As noted, section 3-115 requires three "certificates of the police officer's disability
" from the doctors chosen by the Pension Board.  40 ILCS 5/3-115 (West 2002).
  Webster's dictionary defines a "certificate" as "
a document containing a 
certified 
*** statement," "a signed, written, or printed testimony to the truth of something," and to "certify" is to "to attest *** authoritatively
" or "to confirm or attest *** as being true, meeting a standard, or being as represented."  Webster's Third New International Dictionary 367 (1993).  
We further note that t
he certification requirement is an antifraud provision designed to ensure the integrity of the pension fund
.  
Trettenero
, 333 Ill. App. 3d at 799, 776 N.E.2d at 847
.  
Thus, it would appear that 
Wade
 and 
Rizzo
 were correct in holding that the 
plain and ordinary meaning of the foregoing statutory language requires three formal documents affirmatively attesting that 
the police officer was disabled.  However, as discussed, the court in 
Coyne
 felt compelled to 
give the certification requirement a different meaning because it held that the plain meaning interpretation of section 3-115 is unconstitutional as applied to applicants such as Marconi because it violates their right to procedural due process
.  Under 
Coyne
, though, the certification requirement is reduced to a mere empty formality—even three certificates stating that an applicant is 
not 
disabled would satisfy the statute.  In essence, 
Coyne
 neutered the certification requirement to save it from being struck down.  

We must, therefore, address those infirmities under the plain meaning of the statute, as interpreted by 
Wade
 and 
Rizzo
, that implicate due process considerations.  
The due process clause of the fourteenth amendment provides that a state cannot deprive individuals of certain substantive rights—life, liberty, and property—except pursuant to constitutionally adequate procedures.  
Cleveland Board of Education v. Loudermill
, 470 U.S. 532, 541, 84 L. Ed. 2d 494, 503, 105 S. Ct. 1487, 1493 (1985); 
Mathews v. Eldridge
, 424 U.S. 319, 332, 47 L. Ed. 2d 18, 31, 96 S. Ct. 893, 901 (1976); 
Board of Regents of State Colleges v. Roth
, 408 U.S. 564, 571, 33 L. Ed. 2d 548, 557, 92 S. Ct. 2701, 2706 (1972).  The Supreme Court has long made clear that the property interests protected by procedural due process "extend well beyond actual ownership of real estate, chattels, or money."  
Roth
, 408 U.S. at 572, 33 L. Ed. 2d at 557, 92 S. Ct. at 2706.  Protected property interests include those benefits to which a person has "a legitimate claim of entitlement."  
Roth
, 408 U.S. at 577, 33 L. Ed. 2d at 561, 92 S. Ct. at 2709.  Pension benefits fall into this category.  See Ill. Const. 1970, art. XIII, §5 ("[m]embership in any pension *** system of the State, any unit of local government ***, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired"); 
People ex rel. Sklodowski v. State
, 182 Ill. 2d 220, 228-29, 
695 N.E.2d 374
, 377
 
(1998); 
Miller v. Retirement Board of Policemen's Annuity & Benefit Fund
, 329 Ill. App. 3d 589, 597, 771 N.E.2d 431, 437-38 (2002); 
Stillo v. State Retirement Systems
, 305 Ill. App. 3d 1003, 1009, 714 N.E.2d 11, 16 (1999); 
Wendl v. Moline Police Pension Board
, 96 Ill. App. 3d 482, 486, 421 N.E.2d 584, 587 (1981)
.
  

Although the Supreme Court has never definitively ruled that 
applicants 
for governmental benefits are "entitled" to those benefits in a sense that would entitle them to the same due process protections as the 
recipients 
whose benefits are being terminated, to hold otherwise would leave the applicants "without procedural safeguards against totally arbitrary actions by government administrators."  3 R. Rotunda and J. Nowak, Treatise on Constitutional Law §17.5, at 71 (3d ed. 1999).  Thus, federal circuits have held with virtual unanimity that where a statute purports to spell out an entitlement to governmental benefits, due process attaches not only to the determination of continued eligibility for benefits, but to the initial determination of eligibility as well.  See, 
e.g.
, 
Kelly v. R.R. Retirement Board
, 625 F.2d 486, 490 (3rd Cir. 1980); 
Mallette v. Arlington County Employees' Supplemental Retirement System II
, 91 F.3d 630, 634, 637-38 (4th Cir. 1996); 
Holbrook v. Pitt
, 643 F.2d 1261, 1278 n.35 (7th Cir. 1981); 
Schroeder v. City of Chicago
, 927 F.2d 957, 963 (7th Cir. 1991) (Ripple, C.J., concurring);
 
Daniels v. Woodbury County
, 742 F.2d 1128, 1132-33 (8th Cir. 1984); 
Griffeth v. Detrich
, 603 F.2d 118 (9th Cir. 1979), 
cert. denied
, 445 U.S. 970, 64 L. Ed. 2d 247, 100 S. Ct. 1348 (1980).
(footnote: 7)  
We follow the majority view that applicants for governmental benefits must be afforded due process protections.

We further note that the Pension Board cannot prevail on an argument that because the legislature created an entitlement to a disability pension, it may prescribe whatever application procedures for that benefit it sees fit.  It has been firmly established that the legislature cannot grant persons a right to a benefit which would be an "entitlement" for due process purposes and at the same time, by statutory action, give those persons fewer procedural safeguards than required by due process.  See 
Loudermill
, 470 U.S. at 541, 84 L. Ed. 2d at 503, 105 S. Ct. at 1492-93 (an individual cannot be deprived of life, liberty or property, except pursuant to constitutionally adequate procedures—although the legislature may confer an "entitlement," " 'it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.'  [Citation.]"
); 3 R. Rotunda and J. Nowak, Treatise on Constitutional Law §17.5, at 72 (3d ed. 1999)
.  

Having determined that the safeguards of the due process clause apply to Marconi's application, " 'the question remains what process is due.' "  
Loudermill
, 470 U.S. at 541, 84 L. Ed. 2d at 503, 105 S. Ct. at 1493, quoting 
Morrissey v. Brewer
, 408 U.S. 471, 481, 33 L. Ed. 2d 484, 494, 92 S. Ct. 
2593, 2600 (1972).  As discussed, this question involves constitutional considerations and, thus, "the answer to [it] is not to be found in the [Illinois] statute."  
Loudermill
, 470 U.S. at 541, 84 L. Ed. 2d at 503, 105 S. Ct. at 1493
. 

" 'The fundamental requisite of due process of law is the opportunity to be heard.' "  
Goldberg v. Kelly
, 397 U.S. 254, 267, 25 L. Ed. 2d 287, 299, 90 S. Ct. 1011, 1020 (1970), quoting 
Grannis v. Ordean
, 234 U.S. 385, 394, 58 L. Ed. 1363, 1369, 34 S. Ct. 779, 783 (1914); accord 
Joint Anti-Fascist Refugee Committee v. McGrath
, 341 U.S. 123, 178, 95 L. Ed. 817, 857, 71 S. Ct. 624, 652 (1951) (at a minimum, the Constitution requires notice and some opportunity to be heard).  
In other words, due process requires that the applicant be "given a meaningful opportunity to present [his] case."  
Mathews
, 424 U.S. at 349, 47 L. Ed. 2d at 41, 96 S. Ct. at 909.
  Administrative proceedings are no exception to this rule.  See 
Goldberg
, 397 U.S. at 270, 25 L. Ed. 2d at 300, 90 S. Ct. at 1021; 
Wendl
, 96 Ill. App. 3d at 486, 421 N.E.2d at 587
 (administrative proceedings must conform to the constitutional requirements of due process of law).  

Where the applicant alleges that the administrative proceedings did not afford him due process, we must determine whether he received some kind of a constitutionally adequate hearing.  See 
Mathews
, 424 U.S. at 349, 47 L. Ed. 2d at 41, 96 S. Ct. at 909
.
  
A hearing is intended to allow 
the
 applicant who raises meritorious arguments to affect the outcome of his case.  See 
Loudermill
, 470 U.S. at 543 n.8, 84 L. Ed. 2d at 505 n.8, 105 S. Ct. at 1494 n.8. 
 Put differently, "
[t]he opportunity to present reasons *** why proposed action should not be taken is a fundamental due process requirement
."  (Emphasis added.)  
Loudermill
, 470 U.S. at 546, 84 L. Ed. 2d at 506, 105 S. Ct. at 1495. 
 
Here, the source of substantive meritorious arguments is to be found in the applicable state statutory scheme.  See 
Loudermill
, 470 U.S. at 544-45 nn. 9-10, 84 L. Ed. 2d at 505-06
 
nn. 9-10
, 105 S. Ct. at 1494-95 nn. 9-10
.  The applicant, therefore, is entitled to raise at the hearing
 any factually arguable issues that implicate the statutory requirements
, and t
his right to present one's side of the case "does not depend o
n a demonstration of certain success." 
 
Loudermill
, 470 U.S. at 544, 84 L. Ed. 2d at 505, 105 S. Ct. at 1494.  

The "plain meaning" interpretation of the certification provision, as proffered in 
Wade
 and 
Rizzo
, would not satisfy the minimum due process requirements.  Under that interpretation, an applicant does not receive a disability pension unless all three doctors chosen by the pension board certify him as disabled.  The certification requirement, on its face, gives the applicant no right to question the pension board's choice of doctors or set aside unfavorable certificates thus obtained.  As pointed out in 
Coyne
, in the event that the pension board's doctors do not unanimously certify the applicant as disabled, whatever meritorious arguments the applicant might raise at a hearing have no bearing on the outcome of his case because just one unfavorable certificate renders the entire proceeding pointless
.  In other words, although such applicant may have technically had a hearing, that hearing's negative outcome would have been predetermined before the hearing ever started since, in any event, the lack of unanimous certification by the three doctors would preclude the receipt of the pension.  It has long been established, however, that a hearing with a predetermined outcome is no hearing at all
.  See 
Matthews v. Harney County, Oregon, School District No. 4
, 819 F.2d 889, 893 (9th Cir. 1987); 
Continental Box Co. v. National Labor Relations Board
, 113 F.2d 93, 95-96 (5th Cir. 1940) (" 'It is a fundamental principle that no judicial or quasi judicial hearing is valid, where the maxim "
audi alteram partem
"[translated as "hear the other side"] is ignored, and it is therefore of the essence of a valid judgment that the body which pronounces it shall be unbiased, shall have no interest whatever in the outcome of the issue, and shall not have in any manner prejudged or predetermined it,' " quoting 
Local No. 7 of Bricklayers', Masons' & Plasterers' International Union of America v. Bowen
, 278 F. 271, 278
 
(D.C. Tex. 1922)).  As one court recently explained:

"[I]t is clear that when the evidence establishes that the outcome of a *** hearing has been predetermined regardless of the proof presented, the concerns and goals of the *** hearing as set forth in 
Loudermill
 have not been met. *** [S]uch a hearing *** is, in fact, nothing more than a sham proceeding.  [Citation.]  ***  [I]f countenanced by the [c]ourt, [such a proceeding] would eviscerate the protections afforded *** under the Due Process Clause of the Fourteenth Amendment."  
Wagner v. City of Memphis
, 971 F. Supp. 308, 318-19 (W.D. Tenn. 1997).

The constitutional infirmity of the certification requirement is thus intensified by the fact that the statute gives the Pension Board an absolute right to preselect those doctors 
whose negative position on the issue of disability has been firmly established, 
i.e.
, Dr. Harris, who had served the function as the sole dissenting doctor in several cases discussed so far, namely, 
Knight
, 
Trettenero
, and 
Coyne
.  Therefore, if unfavorable certificates are not challengeable, the applicant's right to a hearing can be effectively denied by the pension board's preselection of its doctors.  

As noted, this unconstitutional infirmity is what compelled the court in 
Coyne
 to reinterpret the statutory language
 to require merely certificates addressing the applicant's disability.  We, however, cannot accept the solution which 
Coyne
 offers.  While we acknowledge the principle that statutory interpretation should not produce unconstitutional results, the interpretation offered in 
Coyne
 would totally neuter the antifraud provision so as to serve no apparent purpose and, therefore, render it meaningless.  In this respect, we must agree with the courts in 
Wade
 and 
Rizzo
 where such interpretation was rejected in favor of the plain meaning consonant with that found in the Webster's dictionary.  Our decision leaves us in a position where we agree with the "plain meaning" interpretation of 
Wade
 and 
Rizzo
 and, on the other hand, agree with 
Coyne
 that the "plain meaning" of the certification requirement leads to unconstitutional results.

Since section 3-115 cannot be saved through reinterpretation
 as proposed in 
Coyne
, we have
 considered whether its constitutionality can be salvaged by reading into it a requirement of good faith and a requirement that a "certificate" encompass a report consistent with the medical certification so that the reports submitted by the examining doctors be consistent with their conclusions in the certificates.  See, 
e.g.
, 
Collins
, 155 Ill. 2d at 112, 610 N.E.2d at 1254 ("the judiciary has the authority to read language into a statute that the legislature omitted through oversight"); 
Wade
, 353 Ill. App. 3d at 861, 819 N.E.2d at 1219 ("[w]e presume that persons who serve on administrative tribunals are fair and honest")
.  This construction would permit cross-examination of the certifying doctors as to the basis of their reports and allow an applicant an opportunity to impeach their certifications.  However, we tend to agree with the 
Coyne
 majority that such an interpolation into the statute which is along the lines suggested, in part, by the 
Coyne
 dissent "is troublesome because it transforms legislative silence into authorization for unspoken acts"
 (
Coyne
, 347 Ill. App. 3d at 729, 807 N.E.2d at 1289).
 

Moreover, although providing for an impeachment of a certificate would appear to cure the constitutional infirmity of section 3-115, that would leave the statute incomplete and unworkable.
  
Under this construction, if an applicant were to successfully challenge the dissenting certificate on the foregoing grounds, that would result in leaving him with fewer than three certificates of disability required under section 3-115.  It has been suggested by 
Wade
's majority, as well as by the dissent in 
Coyne
, that in such a case the pension board should appoint a fourth physician to examine the applicant. See 
Wade
, 353 Ill. App. 3d at 861, 819 N.E.2d at 1219
; 
Coyne
, 347 Ill. App. 3d at 732, 807 N.E.2d at 1291
 (Schmidt, J., concurring in part and dissenting in part)
.  Such a solution, on its face, even if otherwise properly read into the statute, would, in effect, invite a never-ending 
process of impeaching the pension board's hand-picked experts, a result that cannot reasonably be attributed to the legislative intent. 
 Furthermore, even if we were to imply such a provision into section 3-115, that provision, for all practical purposes, would be useless.  As discussed, a doctor should evaluate the applicant's disability at or near the time of the officer's removal from active duty.  See 
Hahn
, 138 Ill. App. 3d at 210, 
485 N.E.2d at 874
.  The results of medical examinations conducted much later—even eight or nine months after the officer's removal from duty, which was the case in 
Hahn
—
are not "pertinent evidence," 
i.e.
, are generally not probative of the applicant's condition at the relevant time.  
Hahn
, 138 Ill. App. 3d at 210, 485 N.E.2d at 874
.  By the same token, any medical examination conducted after a proceeding that resulted in the impeachment of a certificate would, in all likelihood, have taken place years after the officer's removal from duty.  We note that in the instant case, it has been nine years since Marconi was removed from active duty.  It would make no sense to remand the matter to the Pension Board to appoint another doctor to opine on his condition in September of 1996.
  Such an examination, under 
Hahn
, is incapable of producing competent evidence to support a replacement certificate.  
Accordingly, the solution proposed by 
Wade
's majority and the dissent in 
Coyne
 would still leave the statute in a posture where it would require extensive legislative restructuring.

Nor could such extensive 
legislative revision be obviated through judicial interpretation which would permit the applicant to substitute his selected doctors in the place of successfully impeached pension board's certifying
 doctors or, in the alternative, forego the strict requirement of three certificates upon the successful impeachment of one or more of the pension board's doctors.  Such attempted judicial interpolations would be in open contravention to the express language of the statute and, consequently, overtly contrary to its articulated intent.

Where the intent of our legislature cannot be carried out in conformity with the due process requirements, the statute must yield to the Constitution.  See 
Loudermill
, 470 U.S. at 541, 84 L. Ed. 2d at 503, 105 S. Ct. at 1492-93 (an individual cannot be deprived of property except pursuant to constitutionally adequate procedures—although the legislature may confer an "entitlement," " 'it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.'  [Citation.]")
.  
This is not to imply that section 3-115 is facially unconstitutional.  "[A] statute is facially invalid only if no set of circumstances exist under which [it] would be valid."  
In re Parentage of John M.
, 212 Ill. 2d 253, 269, 817 N.E.2d 500, 509 (2004).  Obviously, section 3-115 presents no due process concerns where the three doctors chosen by the pension board unanimously certify an applicant as disabled.  It is with regard to applicants like Marconi that we state that the intent of our legislature cannot be carried out in conformity with the due process requirements.  
Accordingly, 
the certification requirement of section 3-115, as it is currently drafted, is unconstitutional as applied to Marconi and, as such, does not bar him from receiving a disability pension.  Our decision to reverse the Pension Board's ruling in this matter therefore remains unchanged.

Because we have found that it was clearly erroneous for the Pension Board to deny Marconi a disability pension, Marconi is entitled to such, retroactive to the date of his application and subject to periodic eligibility reviews.  In addition, Marconi is entitled to prejudgment interest.  See 
Martino
, 331 Ill. App. 3d at 983, 772 N.E.2d at 296
.
  However, we must remand this matter for further proceedings because the Pension Board did not make a determination as to whether Marconi is entitled to a "line of duty" pension, which pays higher benefits, or a "not on duty" pension.
  Unlike in 
Knight
—where this court instructed the pension board to grant the officer a "line of duty" disability pension because the record contained "ample evidence" that the officer's disability was related to his undercover police work (
Knight
, 338 Ill. App. 3d at 905, 906, 788 N.E.2d 214-15
)—the instant case presents a question of fact as to whether Marconi's disability resulted from his work or from his outside life circumstances.  In this regard, we note that Dr. Conroe opined that Marconi's disability was, to a large degree, work-related.  Dr. Wahlstrom, on the other hand, opined that both the work environment and the outside stressors contributed to Marconi's disability.  Similarly, Dr. Rubens opined that the cause of Marconi's disability was twofold—due to his job as a police officer, as well as his preexisting personality disorder.  In contrast, Dr. Gannellen indicated that Marconi's condition was not directly related to the shooting incidents.
  Given the conflicting evidence in this matter, a remand is necessary.

The Declaratory Action

On appeal from the grant of summary judgment in the declaratory action, Marconi maintains that the Pension Board violated his due process rights because it failed to render a decision on his disability application in a timely manner.  Marconi seeks a declaration that he is entitled to a "line of duty" disability pension as a remedy for that violation.
(footnote: 8)  

Summary judgment is appropriate where the pleadings, depositions, admissions and affidavits on file, viewed in the light most favorable to the nonmovant, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2-1005(c) (West 2002); 
Sollami v. Eaton
, 201 Ill. 2d 1, 6, 
772 N.E.2d 215, 218
 (2002)
.  Our review of a grant of summary judgment is 
de novo
.  
Golden Rule Insurance Co. v. Schwartz
, 203 Ill. 2d 456, 462, 
786 N.E.2d 1010, 1014
 (2003)
.

As Marconi points out, the due process right to be heard encompasses the right to be heard within a reasonable period of time.  See 
Lyon v. Department of Children and Family Services
, 335 Ill. App. 3d 376, 385, 780 N.E.2d 748, 756 (2002) ("[e]xcessive delays in administrative proceedings in which constitutionally protected interests are at stake make the proceedings fundamentally unfair"); 
Kelly
, 625 F.2d at 490 
(due process is violated when the administrative determination of eligibility for benefits takes too long).  With respect to what time delay in processing the application is so long as to become unreasonable, the court in 
Kelly
 stated:

"Although there is no magic length of time after which due process requirements are violated, we are certain that three years, nine months, is well past any reasonable time limit, when no valid reason for the delay is given."
  
Kelly
, 625 F.2d at 490.

Here, as noted, more than five years passed between the time Marconi filed his application and the Pension Board rendered its initial decision.  However, as the Pension Board points out, there is evidence in the record that Marconi consented to some of the delays.  We further note that in the course of the declaratory action, Marconi conducted no discovery to obtain additional facts supporting his due process claims.  On this record, we are unable to determine, as a matter of law, whether 
the delays here violated Marconi's due process rights.

Even if we were to agree with Marconi that his due process rights were violated, it would not change the outcome of this matter.  As a remedy for the due process violation, Marconi asks that we reverse the Pension Board's decision to deny his pension application and order the Pension Board to grant him a "line of duty" disability pension.
  As discussed, we have already decided to reverse the Pension Board's decision as clearly erroneous.  However, we do not agree with Marconi's position that he should be awarded a "line of duty" disability pension because of the Pension Board's misconduct.  Marconi relies on 
Kelly
 and 
Parker v. R.R. Retirement Board
, 441 F.2d 460 (7th Cir. 1971).  His reliance on these cases is misplaced.  
Kelly
 and 
Parker
 did not hold that the remedy for a due process violation is an entitlement to the benefits sought.
  
In both cases, the reviewing court determined that the "substantial evidence" in the record supported the award of the benefits and, consequently, no further hearings were necessary.  See 
Kelly
, 625 F.2d at 495-96; 
Parker
, 441 F.2d at 464
.  
A close reading of these cases also reveals that although the reviewing courts mandated an award of the benefits, no additional compensation was awarded to the plaintiffs for the due process violations
.

In a practical sense, it appears that the remedy for unreasonable delay in the proceedings is of a coercive, rather than a compensatory, nature.  More recently it has been expressed that the most appropriate, and perhaps the only, vehicle for raising claims of unreasonable delay is a 
mandamus
 action.  See 
Schroeder
, 927 F.2d at 960.  As a corollary, it would seem that when the 
mandamus
 action becomes moot, so do such claims of delay.  Marconi's 
mandamus
 action became moot when the Pension Board concluded the hearings and rendered its decision.  In a similar vein, a retroactive receipt of disability benefits would extinguish claims of unreasonable delay, unless irreparable harm resulted from the delay.  See 
Schroeder
, 927 F.2d at 960.  
Our disposition of the administrative appeal, mandating that Marconi receive a disability pension retroactive to the date of his application, extinguishes 
Marconi's due process claims. 
 Marconi cannot claim to have suffered irreparable harm.  As 
Schroeder
 stated:

"[A] loss of the time value of money, consequent on delay in receiving money to which one is entitled, is not considered an irreparable harm, even though it is a real loss, and even if there is no way to recover it."  
Schroeder
, 927 F.2d at 960. 

We, therefore
, need not reach the Pension Board's counterarguments in the declaratory action that Marconi's due process claims were properly dismissed by the circuit court because they were filed after the expiration of the applicable statute of limitations and, in the alternative, because the Pension Board was entitled to quasi-judicial immunity.  
Because no controversy remains in the declaratory action, the circuit court's grant of summary judgment in favor of the Pension Board is affirmed. 

For the reasons set forth above, we affirm the grant of summary judgment in the declaratory action, but reverse the circuit court's affirmance of the Pension Board's decision to deny Marconi a disability pension
 
and remand the matter to the Pension Board for further proceedings consistent with this opinion
.

Affirmed in part and reversed in part; cause remanded.

McBRIDE and O'MALLEY, JJ., concur.

FOOTNOTES
1:
Via his attorney.

2:
The record shows that Marconi was placed on disability leave on September 10, 1996.

3:
Dr. Wahlstrom also called the police chief directly to warn her that Marconi was dangerous to her and made threats about harming her.

4:
Marconi brought a holstered gun with him to the interview.

5:
Which he characterized as a "short-lived depression." 

6:
We note, however, that 
Knight
 preceded 
Rizzo
.

7:
Cf. 
Gregory v. Town of Pittsfield
, 479 A.2d 1304 (Me. 1984), 
cert. denied, sub nom.
 
Peer v. Griffeth
, 470 U.S. 1018, 84 L. Ed. 2d 399
, 105 S. Ct. 1380 (1985), which, in the context of an application for welfare benefits, held that due process did not attach.  

8:
To the extent that Marconi may argue that he is also entitled to compensatory damages, that issue is waived on appeal.  Marconi did not raise the compensatory damages issue in his appellant's brief and raised it for the first time before this court during the oral argument.